2006 UT 35

**UNITED PARK CITY MINES CO., a Delaware corporation, Plaintiff and Appellee,**

v.

**STICHTING MAYFLOWER MOUNTAIN FONDS, a Netherlands association; Stichting Mayflower Recreational Fonds, a general partnership; Stichting Mayflower Recreation; Consolidated Mayflower Mines, Inc., a Utah corporation; Royal Street of Utah; Cooperative Centrale Raiffeisenboerenleenbank, B.A., a Netherlands corporation; May Finance C.V.; Deer Valley Resort, Inc., a Nevada corporation; and Newpark Resources, Inc., a Nevada corporation, Defendants and Appellants.**

No. 20040943.

Supreme Court of Utah.

June 6, 2006.

Rehearing Denied July 17, 2006.

Laura S. Scott, Michael P. Petrogeorge, Salt Lake City, for plaintiff.

E. Craig Smay, Salt Lake City, for appellants Wendy A. Faber, Salt Lake City, for defendant Deer Valley Resort.

Casey K. McGarvey, Salt Lake City, for defendant Newpark Resources.

PARRISH, Justice:

¶ 1 This case stems from the application of a much-favored property right: a cotenant's right to partition. Partition is intended to broker peace between feuding cotenants and promote the productive use of property. The scarcity of relevant case law is perhaps a reflection of the effectiveness and wisdom of the remedy. Nevertheless, a judicial parti-

tion can sometimes breed further contention and dissatisfaction. This is one such case.

¶ 2 Appellants Stichting Mayflower Mountain Fonds and Stichting Mayflower Recreational Fonds (collectively, "Mayflower") challenge the trial court's partition of certain property located in Summit and Wasatch Counties and an accompanying award of owelty. Mayflower contends that appellee United Park City Mines Company ("United Park") waived its right to partition and that it was therefore error for the trial court to order the partition. Alternatively, Mayflower argues that the trial court erred in its calculation of the owelty award and its refusal to order an accounting.

¶ 3 We reject Mayflower's challenge to the trial court's ruling because Mayflower has failed to marshal the evidence as required by rule 24(a)(9) of the Utah Rules of Appellate Procedure. As a result, we assume that the evidence supports the factual findings underlying the ruling. We therefore affirm.

## BACKGROUND

### I. FACTUAL HISTORY

#### A. The Properties

¶ 4 United Park and Mayflower own approximately 342 acres of property (the "Partition Property") as tenants in common. The Partition Property is comprised of certain patented mining claims located in the Uintah Mining District. Approximately 216 acres of the Partition Property lie in Summit County; the remaining acres are located in Wasatch County. The Partition Property is located in an area commonly known as "Upper Mountain."

¶ 5 Additionally, United Park and Mayflower each separately own nearby properties. United Park owns approximately 1400 acres of property located in Summit County (the "United Park Property"). Part of the United Park Property is an 84–acre parcel termed "Mountain Village," which is located in an area commonly known as "Lower Mountain." Another part of the United Park Property is a portion of the "Northside Neighborhood," a planned 63–acre development in Upper Mountain. United Park and

Deer Valley Resort Company ("Deer Valley") are the two main Northside Neighborhood property owners; three others also own interests in the Northside Neighborhood, including Mayflower. Mayflower solely owns approximately 50 to 60 acres of Summit County property (the "Mayflower Property").

#### B. The Annexation and Development Agreement

¶ 6 United Park has long sought to develop the United Park Property. But Summit County zoning regulations, which permitted only one unit of development per 40 acres, prevented large-scale development. In 1994, United Park petitioned Park City for annexation of approximately 1340 acres of land located in Summit County, seeking a regulatory framework more conducive to its development goals. Thus began a long and difficult negotiation process that ultimately culminated in United Park's partition petition.

¶ 7 Park City allegedly responded to United Park's 1994 petition by insisting on two conditions to annexation: (1) that the annexation extend to the Summit County line and cover property owned by several different owners, including the United Park Property, the Mayflower Property, and the portion of the Partition Property lying within Summit County (collectively, the "Flagstaff Development"); and (2) that the Flagstaff Development be subject to a master development agreement (the "Development Agreement") regulating its use and development. United Park continued negotiating with Park City for over four years. United Park and Park City particularly struggled over how much development density to allocate to the Mountain Village and Northside Neighborhood developments. None of the other property owners ever participated in the negotiation process, nor did they bear the associated expenses.

¶ 8 In 1997, the Park City planning commission approved United Park's proposal, which called for development in both the Upper Mountain and Lower Mountain areas. The city council, however, rejected the proposal and passed a resolution restricting development to Lower Mountain. Frustrated,

United Park initiated parallel negotiations with Summit County for a deal that would amend that County's restrictive zoning regulations. Park City resumed negotiations with United Park shortly thereafter, and in 1998, the city council passed a resolution allowing for development on Upper Mountain. The annexation and the Development Agreement were both finalized on June 24, 1999.

¶ 9 The Development Agreement permits 470 residences, 16 single-family lots, and commercial development in Mountain Village. The Development Agreement also allows for the development of up to 38 single-family lots in the Northside Neighborhood. Under the Development Agreement, United Park and Deer Valley are collectively entitled to 30 lots in the Northside Neighborhood. The Development Agreement also authorizes 8 additional Northside Neighborhood lots (the "Conditional Lots"), but only in the event that the other three property owners, including Mayflower, elect to join in the Development Agreement. According to the Development Agreement, all development is to take place within discrete "development pods"; the majority of the Flagstaff Development— approximately 1500 acres—is zoned as "recreational open space."

¶ 10 Approximately 3.5 acres of the Partition Property (the "Adjacent Property") are located adjacent to both the proposed subdivision within the Northside Neighborhood and the Mayflower Property. The Mayflower Property is also located adjacent to the proposed subdivision within the Northside Neighborhood. The portion of the Partition Property located in Wasatch County was not annexed and is not subject to the Development Agreement.

¶ 11 United Park made significant concessions as part of the Development Agreement. In exchange for enhanced development rights in the United Park Property and the Northside Neighborhood, United Park agreed not to develop (1) an approximately 650–acre parcel in Summit County commonly known as "Richardson Flats"; (2) an approximately 90–acre parcel located at the top of Iron Mountain; and (3) a parcel commonly known as "Prospect Ridge." United Park

also agreed to "offer to dedicate to the City a conservation easement[ ] or deed" in order to preserve several parking lots located near City Hall. United Park was also forced to "ratchet down its proposed density" for its development of an approximately 1500–acre parcel in Wasatch County commonly known as "Bonanza Flats." Additionally, United Park committed to operating private shuttle services within Mountain Village, as well as undertaking multi-million dollar road construction and renovation projects. As part of the Development Agreement, Park City acquired a conservation easement over 1,000–plus acres of property owned solely by United Park. United Park also agreed to either construct a gondola between the Flagstaff Mountain Resort and old town Park City or, if Park City demanded, pay one million dollars to Park City.

### C. The United Park–Mayflower Relationship

¶ 12 Throughout its negotiations with Park City, United Park attempted to get Mayflower and the other Flagstaff Development property owners to participate in a joint venture. These efforts ultimately were unsuccessful. On February 25, 1997, Hank Rothwell, the president of United Park, faxed a letter (the "1997 Letter") to Mayflower stating, "United Park or its representatives, will not annex [Mayflower's] property or accept a density approval for [Mayflower's] property without [Mayflower's] notification and permission." The 1997 Letter was purportedly "reconfirmed" on March 20, 1997. Discussions between United Park and Mayflower continued, and on September 3, 1998, Mayflower advised Park City in writing that it objected to the terms of the annexation. United Park grew increasingly frustrated by Mayflower's refusal to participate in any kind of joint venture, and on January 21, 1999, Rothwell sent a letter to Mayflower advising that United Park would "delete Mayflower property from [the] Master Planning effort."

¶ 13 The annexation was finalized on June 24, 1999, pursuant to Park City Ordinance No. 99–30. Although unilateral, the annexation petition was proper under Utah Code section 10–2–403(b) (1999), which requires

that a petition be signed by the owner or owners of "a majority of the private land area within the area proposed for annexation" that is "equal in value to at least 1/3 of the value of all private real property within the area proposed for annexation." Because United Park was the undisputed majority property owner, its petition met these requirements.

## II. PROCEDURAL HISTORY

¶ 14 In February 2000, United Park filed a complaint seeking partition of the Partition Property. As part of the partition process, the trial court appointed three referees to investigate the issues relevant to the partition and to produce a report recommending how the Partition Property should be divided. Each party chose one referee; those two referees in turn selected a third neutral referee.

¶ 15 Over the course of several months, the referees reviewed the history of the annexation process and the resulting Development Agreement. The referees first focused their efforts on deciding how best to physically divide the Partition Property; they then investigated Mayflower's claims that the Development Agreement had resulted in a transfer of development density from the Partition Property and the Mayflower Property to Mountain Village and the Northside Neighborhood. The referees submitted their reports in April 2001. The neutral referee and the United Park referee signed the majority conclusions and recommendations (the "Majority Report"), while the Mayflower referee submitted a separate, dissenting report (the "Minority Report").

¶ 16 The Majority Report recommended that the Partition Property be divided so that United Park and Mayflower each receive approximately 108 acres in Summit County and roughly 63 acres in Wasatch County. Additionally, the Majority Report proposed that Mayflower be granted the Adjacent Property as part of its 108–acre Summit County allotment. The Majority Report further recommended that the trial court award Mayflower 3 or 4 of the Conditional Lots. According to the Majority Report, this award would compensate Mayflower for density that was "probably relocated from the [Partition Property and the Mayflower Property] and clustered into the Northside Neighborhood." In making this recommendation, the authors of the Majority Report stated that they were "convinced that the density in the Flagstaff Development gained from the [Partition Property] and from [the Mayflower Property] is limited to Mayflower's fair portion of the [Conditional Lots] in the Northside Neighborhood."

¶ 17 The Minority Report did not dispute the Majority Report's proposed physical partition of the Partition Property. It disagreed with the Majority Report, however, as to how many of the Conditional Lots Mayflower should be awarded. The Minority Report found that density may have been transferred to Mountain Village from the Partition Property. According to the Minority Report's calculations, Mayflower was possibly entitled to a total of 7.85 to 8.1 lots.

¶ 18 In March 2002, Mayflower amended its answer in the partition lawsuit to allege that United Park, through the 1997 Letter, had waived its right to partition the Partition Property. Both parties filed unsuccessful summary judgment motions in late 2002. In May 2004, the court held a bench trial and subsequently issued a ruling adopting the recommendations of the Majority Report. The trial court issued amended findings of fact, conclusions of law, and an order in October 2004, and Mayflower timely appealed. This court initially transferred the appeal to the court of appeals but subsequently vacated the transfer order and recalled the case. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2002).

## ANALYSIS

¶ 19 Our holding in this case is but the latest in a series of warning signs we must occasionally post for unsuspecting or overly clever parties. The following analysis should serve as frank, severe instruction for those parties who ask us to decide fact-dependent questions under the guise that they present only issues of law.

¶ 20 While Mayflower purports to raise a multitude of issues in its briefs, the sub-

stance of this case can actually be distilled into two discrete questions: (1) whether the trial court erred in determining that United Park did not waive its right to partition; and (2) whether the trial court abused its discretion in fashioning the owelty award. Mayflower also requests an accounting. Because we conclude that Mayflower's claim for an accounting is duplicative of its request for an additional owelty award, we refuse to consider that claim. We therefore focus on the questions of waiver and owelty and discuss each in turn.

## I. WAIVER

¶ 21 Whether a party has effectuated a waiver is a mixed question of law and fact. *Chen v. Stewart*, 2004 UT 82, ¶ 23, 100 P.3d 1177; *see also U.S. Realty 86 Assocs. v. Sec. Inv., Ltd.*, 2002 UT 14, ¶ 11, 40 P.3d 586. As we explained in *Pledger v. Gillespie*, 1999 UT 54, ¶ 16, 982 P.2d 572, "[W]hether the trial court employed the proper standard of waiver presents a legal question which is reviewed for correctness, but the actions or events allegedly supporting waiver are factual in nature and should be reviewed as factual determinations." Accordingly, we "grant broadened discretion to the trial court's findings" when reviewing questions of waiver. *Chen*, 2004 UT 82, ¶ 23, 100 P.3d 1177.

¶ 22 We have repeatedly applied the rule clarified in *Soter's, Inc. v. Deseret Federal Savings & Loan Ass'n*, 857 P.2d 935, 942 (Utah 1993), when evaluating questions of waiver. "A waiver is the intentional relinquishment of a known right. To constitute waiver, there must be an existing right, benefit, or advantage, a knowledge of its existence, and an intention to relinquish it." *Id.* (internal quotation marks omitted); *see also In re Flake*, 2003 UT 17, ¶ 30, 71 P.3d 589. Questions of waiver often hinge on the critical third element of intent. We have explained that the intent to relinquish a right must be distinct and that fact-finders should "look[ ] at the totality of the circumstances" in discerning intent. *Id.*

¶ 23 Mayflower argues that United Park waived its right to seek a partition of the property. And there is no dispute that the first two elements of waiver were satisfied here: United Park had the right to a partition and was aware of that right. Accordingly, the existence of a waiver turns on the question of intent. On this point, the trial court found that "United Park ha[d] not waived its right to partition[;][t]he [1997 Letter] ... did not evidence an intent by United Park to waive its right to partition." Because the issue of intent is determinative here, Mayflower must successfully challenge this factual finding if we are to reverse the trial court's ruling. This requires that Mayflower marshal all the evidence supporting that finding. Utah R.App. P. 24(a)(9). Because Mayflower has failed to do so, we assume that the evidence supports the finding and consequently affirm.

¶ 24 Rule 24(a)(9) of the Utah Rules of Appellate Procedure requires "[a] party challenging a fact finding [to] first marshal all record evidence that supports the challenged finding." *See also State v. Clark*, 2005 UT 75, ¶ 17, 124 P.3d 235; *Wilson Supply, Inc. v. Fradan Mfg. Corp.*, 2002 UT 94, ¶ 21, 54 P.3d 1177. To pass this threshold, parties protesting findings of fact must "marshal all the evidence in support of the finding and then demonstrate that the evidence is legally insufficient to support the finding even when viewing it in a light most favorable to the court below." *Clark*, 2005 UT 75, ¶ 17, 124 P.3d 235 (internal quotation marks omitted).

¶ 25 That waiver is a mixed question of law and fact does not relieve Mayflower of this important task. "Even where the defendants purport to challenge only the legal ruling, as here, if a determination of the correctness of a court's application of a legal standard is extremely fact-sensitive, the [appellants] also have a duty to marshal the evidence." *Chen*, 2004 UT 82, ¶ 20, 100 P.3d 1177. Mayflower cannot dodge this duty by attempting to frame the issues as legal ones. Because the question of waiver is so dependent on factual findings, Mayflower must marshal the evidence if it seeks to challenge the trial court's determination of that question.

¶ 26 Mayflower has not done so. It ostensibly makes an effort to marshal the evidence on pages 21–22 of its brief: "It marshals the evidence ... to present the [1997 Letter] and testimony [of one witness]." But contrary to Mayflower's wistful assertion, presenting evidence supporting the challenged conclusion does not satisfy the marshaling requirement. Parties cannot discharge their duty by "simply provid[ing] an exhaustive review of all evidence presented at trial." *Chen,* 2004 UT 82, ¶ 77, 100 P.3d 1177. Rather, parties are required to

> "temporarily remove [their] own prejudices and fully embrace the adversary's position"; [they] must play the "devil's advocate." In so doing, appellants must present the evidence in a light most favorable to the trial court and not attempt to construe the evidence in a light favorable to their case.... In sum, to properly marshal the evidence the challenging party must demonstrate how the court found the facts from the evidence and then explain why those findings contradict the clear weight of the evidence.

*Id.* ¶ 78 (quoting *Harding v. Bell,* 2002 UT 108, ¶ 19, 57 P.3d 1093) (citations omitted). What Mayflower has done instead is "merely re-argue the factual case ... presented in the trial court," *id.* ¶ 77, leaving United Park and this court to bear the expense and time of performing the critical task of marshaling the evidence. This is unfair, inefficient, and unacceptable. *See id.*

¶ 27 We repeatedly have warned of the grim consequences parties face when they fail to fulfill the marshaling requirement. When parties fail to perform this critical task, we can rely on that failure to affirm the lower court's findings of fact. *Id.* ¶ 80; *see also Clark,* 2005 UT 75, ¶ 17, 124 P.3d 235. We therefore affirm the trial court's factual findings, including its determination that United Park did not intend to waive its right to partition. Because we accept that finding of fact, we must also affirm the trial court's conclusion that United Park did not waive its right to partition.

## II. OWELTY

¶ 28 Because this court has rarely reviewed owelty awards, we understand both parties' confusion as to the applicable standard of review. We therefore pause to clarify the correct standard. The owelty remedy, though enabled by statute, Utah Code Ann. § 78–39–41 (2002), is an equitable form of relief. The statute itself recognizes the equitable nature of owelty: it empowers courts "to make compensatory adjustment among the parties according to the *principles of equity." Id.* (emphasis added). This is consistent with our characterization of partition, which we have held to be "an equitable action," in part because "[t]he fundamental objective in a partition action is to divide the property so as to be *fair and equitable* and confer no unfair advantage on any of the cotenants." *Blonquist v. Frandsen,* 694 P.2d 595, 596 (Utah 1984) (emphasis added). We therefore review awards of owelty as we do other forms of equitable relief.

¶ 29 In equity cases, we review the trial court's legal conclusions for correctness. *RHN Corp. v. Veibell,* 2004 UT 60, ¶ 35, 96 P.3d 935. We grant considerable deference to the trial court's factual findings and will not reverse those findings unless they are clearly erroneous. *Id.*

¶ 30 The equitable distribution of property, however, involves more than factual findings and legal conclusions: it requires trial courts to "balance[ ] the relative significance of the facts and applicable law in order to achieve a fair and equitable result. This balancing requires the exercise of discretion." *Parduhn v. Bennett,* 2005 UT 22, ¶ 23, 112 P.3d 495. In partition actions, trial courts are specifically "accorded broad discretion in fashioning an appropriate decree." *Gillmor v. Gillmor,* 657 P.2d 736, 739 (Utah 1982). We will affirm a trial court's exercise of that broad discretion unless it was abused. *Id.*

¶ 31 Owelty is a remedy sometimes awarded in conjunction with a partition order. When a partition cannot be made without "great prejudice" to a cotenant, the trial court, by statute, is permitted to order a sale of the property. Utah Code Ann. § 78–39–1 (2002). Owelty is an equitable alternative to this often undesirable result. Under Utah

Code section 78–39–41, a court can go forward with the partition and award owelty to a prejudiced party in order to compensate for any inequality suffered by that party. In the past, this court has expressed a preference that trial courts award owelty rather than forcing a sale. *See Clawson v. Silver,* 2001 UT 42, ¶¶ 11, 12, 26 P.3d 209. We reemphasize this preference: "a public sale should be a last resort," especially in cases where "both [parties] desire to retain an interest" in the property to be partitioned. *Id.* ¶ 12.

■ ¶ 32 Mayflower does not contest the trial court's actual physical division of the Partition Property. Rather, it challenges the owelty award, contending that the 4 Conditional Lots awarded by the trial court do not sufficiently compensate it for the prejudicial impact of the partition. Because Mayflower has failed to marshal the evidence supporting the owelty award, however, we cannot conclude that the trial court abused its discretion.

■ ¶ 33 The trial court undertook an intensive factual inquiry in determining the owelty award. Pursuant to section 78–39–41, the trial court was required to determine whether the partition could be made "equally among the parties ... without prejudice to the rights and interests of" Mayflower. This was clearly a question of fact. *See Clawson,* 2001 UT 42, ¶ 10, 26 P.3d 209 ("Whether ... a partition can be made without great prejudice to the owners is a question of fact." (internal quotation marks omitted)).

¶ 34 The partition order entered by the trial court included the award of owelty in the form of the 4 Conditional Lots that had been recommended by the Majority Report, thus reflecting the trial court's conclusion that an equal partition could not be achieved absent an award of some additional compensation to Mayflower. In reaching this conclusion, the trial court reviewed the voluminous record, which includes witness testimony, transcripts of city meetings, and the Majority and Minority Reports, and concluded that Mayflower had failed to "present any evidence that the physical division of the Partition Property recommended by the [majority] referees is not fair or eq-

uitable." The trial court then had to "adjudge compensation" that would remedy any "inequality" resulting from the partition. Utah Code Ann. § 78–39–41. This task again required that the trial court survey the record and consider issues of fact.

¶ 35 First, the trial court had to determine the extent of the inequality to be remedied by the owelty award. The court specifically focused on whether any density had been transferred from the Partition Property or the Mayflower Property to Mountain Village or the Northside Neighborhood. While the trial court apparently agreed with the Majority Report's conclusion that some density was "probably" transferred "from the [Partition Property and the Mayflower Property] and clustered into the Northside Neighborhood," it otherwise found that "no evidence was produced as a basis for [Mayflower's] claims for relief." Thus, like the drafters of the Majority Report, it was "convinced that the density in the Flagstaff Development gained from the [Partition Property] and from [the Mayflower Property] [was] limited to Mayflower's fair portion of the [Conditional Lots] in the Northside Neighborhood."

¶ 36 In addition to considering evidence concerning the alleged density transfers, the trial court had to consider the amount of compensation necessary to achieve a fair and equitable partition. This again required that the trial court consider the evidence presented, including the recommendations and calculations in the Majority and Minority Reports. The trial court ultimately decided that it would be appropriate to award Mayflower 4 of the Conditional Lots in order to offset the inequality produced by the probable transfer of density to the Northside Neighborhood.

■ ¶ 37 This examination of the issues of prejudice, inequality, and compensation undergirded the trial court's eventual exercise of its discretionary powers in fashioning the owelty award. When parties appeal a court's fact-sensitive use of its discretionary powers, they "must successfully challenge the factual findings upon which the trial court's decision ... depended." *Chen v. Stewart,* 2004 UT 82, n. 14, 100 P.3d 1177. This requires that parties marshal

the evidence. As we have previously explained, parties who ask this court to consider fact-sensitive questions—including those questions reviewed under an abuse of discretion standard—have a duty to marshal all the evidence that formed the basis for the trial court's ruling. *See id.* (holding that parties had a duty to marshal the evidence when challenging the appointment of an interim CEO, a question reviewed under an abuse of discretion standard).

¶ 38 We reaffirm the deliberate, clear instruction found in our prior decisions regarding the marshaling obligation and emphasize that the labels given particular issues by courts or counsel are not determinative. Rather, the critical element triggering the duty to marshal is factual inquiry. Parties seeking appellate review must marshal the evidence on those questions that require substantive factual inquiry, regardless of whether those questions are reviewed for clear error or abuse of discretion. Otherwise, this court will not question a lower court's factual analysis and will instead assume that the evidence supports the challenged findings.

¶ 39 In challenging the owelty award, Mayflower had a duty to marshal all of the evidence supporting the award, including evidence relevant to the questions of inequality and appropriate compensation. Even if the challenged ruling did not specifically reference all such evidence, Mayflower was nevertheless required to present "every scrap of competent evidence introduced at trial which supports the very findings [it] resists." *Id.* ¶ 77. This enables the reviewing court to evaluate fact-centric arguments in the context of the entire body of evidence.

¶ 40 Mayflower has shirked that responsibility here. It has neither corralled the evidence supporting the compensation calculation of the trial court nor reviewed the evidence relating to the alleged density transfers "in a light most favorable to the trial court." *Id.* ¶ 78. Instead, Mayflower has cobbled together disjointed arguments and repeatedly highlighted and restated only that evidence favorable to its position.

¶ 41 Because Mayflower has not properly challenged the factual basis underlying the owelty award, we cannot conclude that the

trial court abused its discretion. We therefore affirm the trial court's award of owelty.

### III. ACCOUNTING

¶ 42 Finally, Mayflower argues that the trial court erred by not requiring United Park to account for profits it received as a result of the annexation. We decline to analyze this claim on the ground that it is duplicative of Mayflower's claim for owelty. Indeed, the accounting claim hinges on the same familiar question of fact: whether the alleged transfers of density actually occurred. And the amount awarded under either remedy would be shaped by the same consideration: the benefits or profits received by United Park as a result of the alleged density transfers.

¶ 43 Furthermore, because the resolution of Mayflower's request for an accounting hinges on a question of fact, Mayflower has a corresponding duty to marshal the evidence supporting the trial court's findings on that question. As explained above, Mayflower has failed to do so and therefore has not effectively demonstrated that the trial court erred in failing to order an accounting.

### CONCLUSION

¶ 44 Unless appellants marshal the evidence relevant to fact-dependent questions, they risk having their appeals rejected without consideration of those questions. Despite this frequently repeated counsel, parties sometimes attempt a second bite at the factual apple without first fulfilling this well-established duty. This tactic may be particularly appealing when a party attempts, as Mayflower has done here, to characterize the issues as issues of law that are not reviewed under a clearly erroneous standard. The duty is not, however, contingent on labels and standards of review; it instead springs when an evaluation of the record is central to the task confronting the reviewing court.

¶ 45 While this duty may seem to place appellants in the disadvantageous position of advocating the arguments they seek to rebut, it may often have the unexpected benefit of bolstering the cogency of the arguments they

actually advance. Additionally, and more importantly, fairness and judicial economy compel us to vigorously enforce the threshold marshaling requirement found in rule 24(a)(9). Because *Mayflower* has not met this threshold, we must assume that the evidence supports the factual findings underlying the trial court's decision and therefore affirm.

¶ 46 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT and Judge QUINN concur in Justice PARRISH'S opinion.

¶ 47 Having disqualified himself, Justice NEHRING does not participate herein; District Court Judge ANTHONY B. QUINN sat.