2007 UT App 407

### TRACO STEEL ERECTORS, INC., Plaintiff and Appellant,

v.

### COMTROL, INC.; GOS's Welding Inc.; and DWAMCO, Inc., Defendants and Appellee.

No. 20060916–CA.

Court of Appeals of Utah.

Dec. 28, 2007.

Ralph R. Tate and Stephen B. Doxey, Salt Lake City, for Appellant.

Cass C. Butler and Michael D. Stanger, Salt Lake City, for Appellee.

Before Judges BILLINGS, DAVIS, and McHUGH.

## OPINION

**BILLINGS, Judge:**

¶ 1 Traco Steel Erectors, Inc. (Traco) appeals the trial court's order granting partial summary judgment to Comtrol, Inc. (Comtrol). Traco also appeals the trial court's calculation of damages awarded to Comtrol and the trial court's determination that Traco could not recover for certain change orders. Further, Traco appeals the trial court's interpretation of two subcontractor lien releases. Finally, Traco appeals the trial court's determination that Comtrol is the prevailing party for the purpose of awarding attorney fees. We affirm.

## BACKGROUND

¶ 2 Comtrol is a general contractor and Traco is a steel erector subcontractor. Comtrol and Traco entered into similar subcontractor agreements for the construction of three separate projects: (1) the United States Army Reserve Center (the Army Reserve Project), (2) the Utah Valley State College Student Center Expansion (the UVSC Project), and (3) the Weber State University Visual Arts Center (the Weber State Project). We discuss each project in turn.

### The Army Reserve Project

¶ 3 On October 28, 1998, Comtrol and Traco entered into a subcontract agreement (the Army Reserve Agreement) for steel erection on the Army Reserve Project in Salt Lake City, Utah. The contract amount for the Army Reserve Project was $42,100. The Army Reserve Agreement also provided that $3900 would be added to the subcontract amount if Traco provided a crane to perform its work.

¶ 4 Traco rented a crane from a rental agency for approximately one to three days and then returned the rented crane. For the remainder of its work on the job, Traco used Comtrol's crane and Comtrol's crane operator. On November 7, 2000, Comtrol issued Change Order 4258, back charging Traco $13,345 for crane usage and additional work Comtrol had to perform to complete Traco's obligations under the Army Reserve Agreement. In response to Change Order 4258, Traco admitted that Comtrol had performed some of Traco's work, but disputed the back charge amounts in Change Order 4258. Specifically, Traco disputed the back charges relating to crane usage because Comtrol was to supply the crane under the Army Reserve Agreement. Traco never signed Change Order 4258. Prior to disputed Change Order 4258, various other change orders had been approved. The last change order approved prior to disputed Change Order 4258 indicated a contract total of $64,218.90.

¶ 5 On November 28, 2000, Comtrol issued Change Order 4263, which Tracy Bronson, president of Traco, signed. Change Order 4263 included a back charge of $850 and revised the Army Reserve Agreement total to $50,023.90. Although it was not specifically stated in Change Order 4263, the revised total represented a deduction of the disputed back charge in Change Order 4258 in the amount of $13,345. Change Order 4263 also stated:

> It is understood and agreed that the acceptance of this contract modification by the subcontractor constitutes an accord and satisfaction, and represents the final adjustment of any and all costs, delays, time extensions or other equitable adjustment, if any, arising out of, or incidental to, the work herein revised. NOTE: This Change Order becomes part of and in conformance with the existing contract.

At his deposition on February 10, 2005, Bronson testified that he understood that Change Order 4263 revised the contract amount to $50,023.90.

¶ 6 For Traco's work on the Army Reserve Project, Comtrol paid Traco $59,201.95 in seven payments. Comtrol sought summary judgment with respect to the Army Reserve Project, contending that Change Order 4263 was a valid accord and satisfaction of the parties' agreement regarding the Army Reserve Agreement amount. However, in opposing Comtrol's summary judgment motion, Traco submitted an affidavit from Bronson stating that he made a mistake in signing Change Order 4263. Bronson's affidavit asserts that he signed Change Order 4263 ap-

proving a back charge of $850, but failed to notice that Comtrol had inserted into Change Order 4263 a revised contract balance of $50,023.90, which had been changed to deduct the disputed back charge of $13,345.

¶ 7 The trial court granted Comtrol's motion for partial summary judgment and ruled that Change Order 4263 was a valid accord and satisfaction entitling Comtrol to summary judgment for the $9178.05 it had overpaid Traco for the Army Reserve Project.

### The UVSC Project

¶ 8 On May 24, 2000, Comtrol and Traco entered into another subcontract agreement (the UVSC Agreement) for steel erection on the UVSC Project, located in Orem, Utah. The UVSC Agreement contract amount was $111,000. The contract amount was reduced to $108,406.22 by various approved change orders and by Owner Controlled Insurance Program (OCIP) adjustments. Over the course of the UVSC Project, Comtrol made multiple payments to Traco totaling $97,488.05. This left a balance on the UVSC Agreement in the amount of $10,918.17.

¶ 9 In addition to the approved change orders, Comtrol issued back charges against Traco relating to work that Traco was to perform under the UVSC Agreement, but that Comtrol had to perform because Traco either did not provide an adequate work force, used Comtrol's crane and forklift to unload steel that had arrived at the job site, or refused to perform the work. These back charges totaled $20,748.17.

¶ 10 The work on the UVSC Project required tight coordination with the other subcontractors, inasmuch as there was a very limited staging area and Traco's work had to be performed in four discrete stages. To complete its obligations under the UVSC Agreement, Traco was required to break up the timing of its work. However, during the course of the UVSC Project, Traco personnel did not attend the weekly meetings that Comtrol held to coordinate the timing of the work among subcontractors. The trial court determined that Traco's absence from these meetings seriously impacted coordination among the subcontractors, particularly with respect to the coordination of steel deliveries by Dwamco, the steel fabricator.

¶ 11 Traco performed its first portion of the work, Phase I, in June and July of 2000. Twice during this period, July 18 and July 28, 2000, Traco asked for permission to use Comtrol's crane, forklift, and manpower to unload steel. Traco understood that it might be charged for the use of Comtrol's services. Eugene Cook, Comtrol's superintendent, noted potential back charges on daily reports and on time cards of Comtrol employees who helped unload the steel. Change Order 4268 was issued to reflect those back charges.

¶ 12 By January 2001, Traco began its work on the other phases of the project. On April 4, 2001, Comtrol advised Traco that Traco was behind schedule and was impacting other trades. Traco had been using two-to-four-man crews over the prior three weeks, which was insufficient to maintain adequate progress on the project. Comtrol wrote a letter reminding Traco of the liquidated damages UVSC would impose on Comtrol if the project was not completed on time. Comtrol directed Traco to return to work immediately and regain the lost time.

¶ 13 On May 30, 2001, Traco executed a Subcontractor Lien Waiver (the UVSC Release) that waived and released Traco's right to any claims for labor and materials provided to the UVSC Project on or before April 30, 2001. This release was in exchange for Comtrol's payment of $56,923.05 to Traco.

¶ 14 Throughout 2001, Traco continued to use Comtrol's crane and forklift to unload steel for the UVSC Project. In one case, this was done without Comtrol's permission, as Traco came to the job site on Sunday, May 6, 2001, when Comtrol was not on the job. Cook continued to note Traco's use of Comtrol's forklift and crane on time cards and daily reports, resulting in Change Orders 4569 and 4700.

¶ 15 With the exception of railings and punch list items, which were within the scope of Traco's work under the UVSC Agreement, Traco's work was completed by the end of September 2001. In early January 2002, Comtrol advised Traco orally that railing materials had been delivered to the job site and

requested that Traco return to install the railings according to the UVSC Agreement. Traco refused to do so. On January 3, 2002, Comtrol gave Traco a written 48–hour notice to report to the project, initiate work, and perform diligently. Comtrol advised Traco that if it did not return, Comtrol would have the work performed by others and back charge Traco. Traco responded that it would not return until it was paid "all outstanding Contract Draws and Change Orders." Traco further demanded that the hand railings be made part of a change order.

¶ 16 The UVSC Agreement provided that in the event of a dispute as to the scope of the work, Traco would still be required to "promptly follow [Comtrol's] written orders," and the "dispute [would] be settled later." The UVSC Agreement also stated that Traco "will not interrupt or delay its work because of any dispute with [Comtrol], but will continue to perform its subcontract work diligently to completion, and will later negotiate in good faith for settlement of the dispute." Traco refused to return and abandoned the job.

¶ 17 Thereafter, Comtrol and another subcontractor performed the hand railing work, as well as other uncompleted Traco work. To complete the work, Comtrol back charged Traco $17,279.73. However, the trial court found this amount to be excessive and reduced the back charged amount to $8900, which the trial court found to be a reasonable, fair-market amount for Comtrol's completion of Traco's work.

¶ 18 The trial court determined that when Comtrol's back charges, including those for completion of the work as determined by the court, are subtracted from the $10,918.17 remaining contract balance, the balance shifts to Comtrol's favor, with Traco owing Comtrol $1450.27.

¶ 19 Traco, however, also asserted multiple back charges and change orders totaling $19,753.25 that it claimed should have been factored into the final contract analysis for the UVSC Project. These back charges and change orders are the result of another subcontractor's—Dwamco—steel fabrication errors that Traco had to repair. Traco raised these errors to Comtrol and Dwamco, and then made arrangements with Dwamco to repair the errors. Thereafter, Traco and Dwamco agreed that Traco would repair the steel. They further agreed upon the price that Dwamco would pay to Traco once Traco made the repairs. Comtrol was not a party to these agreements, nor was it involved in the negotiations that gave rise to Traco and Dwamco's agreement. Still, Traco sought to invoice Comtrol for the steel repair work Traco performed. Comtrol consistently told Traco that it should look to Dwamco for recovery. Traco did actually invoice Dwamco for Traco's work, and sued Dwamco for recovery on the work Traco performed.

¶ 20 Moreover, the trial court found that Traco's change orders were deeply flawed for several reasons. First, Comtrol did not approve any of Traco's change orders prior to Traco's abandonment of the job. Second, the trial court found that the change orders relating to the steel repair failed to demonstrate any meeting of the minds between Traco and Comtrol on the integral elements of an agreement, including price or a method for determining price, rendering the proposed change orders too indefinite and uncertain for enforcement.

¶ 21 Additionally, the trial court found that seven of the UVSC Project change orders that Traco submitted, totaling $10,355.25, sought recovery for work that Traco waived in the UVSC Release, in that the work was performed prior to April 30, 2001—the effective date of the release. Finally, the UVSC Agreement provides that "[Comtrol] shall not be obligated to [Traco] for any amount greater than [Comtrol] receives from the Owner for the change." The trial court found that Traco's failure to timely submit its proposed change orders prevented Comtrol from seeking approval from the Owner. Therefore, Comtrol did not receive any increased amount from the Owner, which Comtrol has not paid to Traco.

### The Weber State Project

¶ 22 On July 14, 2000, Comtrol and Traco entered into a third subcontract agreement (the Weber State Agreement) for steel erec-

tion on the Weber State Project for a price of $270,000, subject to adjustments for change orders. Due to various change orders and OCIP adjustments, the contract amount was reduced to $254,658.24. Over the course of the Weber State Project, Comtrol made various payments to Traco totaling $252,977.85. The trial court found, after considering the amounts to which the parties agreed and the amounts Comtrol paid Traco, that the balance on the Weber State Agreement was $1680.39.

¶ 23 As with the UVSC Project, the Weber State Project had a small staging area and required coordination among the subcontractors. Traco failed to attend weekly job site meetings where Comtrol coordinated the work of all the subcontractors on the Weber State Project. The trial court determined that although Comtrol's project manager faxed the meeting minutes and punch lists to Traco, Traco's absence from these weekly meetings seriously impacted coordination among the subcontractors.

¶ 24 As the project progressed, Traco fell behind in its work. Traco also failed to inventory the steel components delivered to the job site by the steel fabricator. Moreover, without Comtrol's permission, Traco removed steel from the job to use on an unrelated project Traco was performing for another general contractor working at Weber State University.

¶ 25 On October 17, 2001, Traco executed a Subcontractor Lien Waiver (the Weber State Release) that waived and released Traco's rights to any claims for labor and materials provided to the Weber State Project on or before August 31, 2001. The Weber State Release was in exchange for Comtrol's payment of $18,054 to Traco.

¶ 26 Ten of Traco's proposed change orders on the Weber State Project, totaling $17,780, sought recovery for work that was waived by the Weber State Release, in that the work was performed on or before August 31, 2001—the effective date of the Weber State Release.

¶ 27 Traco continued to fall behind in its work and blamed Comtrol for this delay because it believed that steel components had not been delivered to the job site. By December 2001, Traco's work was incomplete. Traco continued to blame the steel fabricator and informed Comtrol, by letter dated January 4, 2002, that if all steel for the project was not on site by 4:00 p.m. that day, it would become the steel fabricator's responsibility to install the steel. Comtrol responded that there were other steel components on the job site, which Traco could erect while waiting for the missing steel to arrive. Moreover, some of the missing parts could not be fabricated until later inasmuch as such parts were dependant upon field measurements that could not be taken until other portions of the project were first completed.

¶ 28 In January 2002, Comtrol was forced to take over Traco's work on the Weber State Project because Traco had informed Comtrol that it was abandoning the job. Comtrol notified Traco in writing that under the Weber State Agreement, Comtrol would perform Traco's work and would look to Traco to recover its costs in completing Traco's contract.

¶ 29 Comtrol made numerous phone calls to Traco to return to the job site to perform its obligations and mitigate the damages. Traco refused to return to work. In the course of completing Traco's work, Comtrol incurred $58,212.50 in expenses.

¶ 30 Traco filed the complaint in this matter on May 27, 2004, seeking recovery of damages on the three projects with Comtrol. Comtrol filed a countersuit claiming damages for finishing work that Traco was required to finish under the subcontract agreements. During the course of litigation, the trial court granted partial summary judgment in favor of Comtrol. After a bench trial on the merits, the trial court awarded damages and attorney fees to Comtrol. Traco now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 31 On appeal, Traco first argues that the trial court erred in granting partial summary judgment in favor of Comtrol regarding the Army Reserve Project because there were disputed issues of material fact as to whether there had been an accord and satisfaction between the parties. "Summary

judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. On appeal, we review the [trial] court's ruling on summary judgment for correctness." *Jackson v. Mateus*, 2003 UT 18, ¶ 6, 70 P.3d 78 (citing Utah R. Civ. P. 56(c)).

¶ 32 Second, Traco contends that the trial court erred in calculating Comtrol's damages. Rule 24(a)(9) of the Utah Rules of Appellate Procedure requires "[a] party challenging a fact finding [to] first marshal all record evidence that supports the challenged finding." *United Park City Mines v. Stichting Mayflower Mountain Fonds*, 2006 UT 35, ¶ 24, 140 P.3d 1200; *see also* Utah R.App. P. 24(a)(9).

¶ 33 Third, Traco asserts that the trial court erred in finding that Traco could not recover payment for work that it performed outside the scope of the parties' original agreement, when Comtrol's superintendent directed Traco to perform such work. Again, in challenging the trial court's finding, Traco must "marshal all record evidence that supports the challenged finding." *Id.*

¶ 34 Fourth, Traco argues that the trial court erred in concluding that the lien waivers that Traco executed were enforceable as waivers of Traco's claims for work predating the effective dates on those waivers. "We review the trial court's interpretation of the agreement for correctness, according no deference to the court's conclusions of law." *Peirce v. Peirce*, 2000 UT 7, ¶ 18, 994 P.2d 193; *see also Zions First Nat'l Bank v. National Am. Title Ins. Co.*, 749 P.2d 651, 653 (Utah 1988) ("Questions of contract interpretation not requiring resort to extrinsic evidence are matters of law, and on such questions we accord the trial court's interpretation no presumption of correctness.").

¶ 35 Fifth, Traco claims that the trial court erred in awarding attorney fees to Comtrol after determining that Comtrol was the prevailing party. "The award of attorney fees is a matter of law, which we review for correctness." *Jensen v. Sawyers*, 2005 UT 81, ¶ 127, 130 P.3d 325. However, a trial court's determination of the prevailing party

is reviewed under an abuse of discretion standard. *See Lunceford v. Lunceford*, 2006 UT App 266, ¶ 10, 139 P.3d 1073.

## ANALYSIS

### I. Accord and Satisfaction

¶ 36 Traco first argues that the trial court erred in awarding partial summary judgment to Comtrol regarding the Army Reserve Project because there were issues of material fact relating to whether there was an accord and satisfaction between the parties. Under the Army Reserve Agreement, the initial contract amount was $42,100. This contract amount was revised over the course of the Army Reserve Project through various change orders. The final change order that Traco signed—Change Order 4263—revised the total contract amount to $50,023.90. Change Order 4263 also contained language expressly stating that "acceptance of this contract modification by the subcontractor constitutes an accord and satisfaction, and represents the final adjustment of any and all costs, delays, time extensions or other equitable adjustment, if any, arising out of or incident to, the work herein revised."

¶ 37 Comtrol filed a motion for summary judgment arguing that by signing Change Order 4263, Traco agreed to a revised total for the Army Reserve Agreement of $50,023.90. As support for this argument, Comtrol relied on Change Order 4263 itself and on Bronson's deposition. During his deposition, Bronson testified that he understood that by signing Change Order 4263, the contract total was effectively revised to $50,023.90. However, in response and opposition to Comtrol's motion for summary judgment, Traco submitted an affidavit from Bronson stating that he had mistakenly signed Change Order 4263 without observing the revised contract total.

¶ 38 Regarding summary judgment motions,

[t]he general rule is that ... "when a party takes a clear position in a deposition, that is not modified on cross-examination, he may not thereafter raise an issue of fact by his own affidavit which contradicts his

deposition, unless he can provide an explanation of the discrepancy."

*Harnicher v. University of Utah Med. Ctr.,* 962 P.2d 67, 71 (Utah 1998) (quoting *Webster v. Sill,* 675 P.2d 1170, 1172–73 (Utah 1983)). Bronson's deposition testimony and his affidavit clearly contradict each other. Moreover, Traco offers no explanation for the discrepancy except to say that Bronson made a mistake in testifying during his deposition that he understood Change Order 4263 revised the total contract amount to $50,023.90.[1] We conclude that because Bronson's affidavit contradicts his deposition testimony, Traco cannot use Bronson's affidavit to assert that an issue of material fact exists as to whether the parties reached an accord and satisfaction regarding the Army Reserve Project.

¶ 39 Moreover, Traco argues that there was no consideration given to Traco for reducing the contract balance and entering into an accord and satisfaction. "Generally the elements of a contract must be present in an accord and satisfaction, including proper subject matter, offer and acceptance, competent parties, and consideration." *Neiderhauser Builders & Dev. Corp. v. Campbell,* 824 P.2d 1193, 1197–98 (Utah Ct.App.1992) (internal quotation marks omitted). We conclude that on its face, Change Order 4263 sets forth an exchange of consideration between Traco and Comtrol. Traco received consideration because it was excused from having to perform a portion of its contract that Comtrol had performed instead. Change Order 4263 resolved the parties' contractual responsibilities and reduced the contract price to $50,023.90. Accordingly, we affirm the trial court's grant of partial summary judgment in favor of Comtrol, including its holding that there was an accord and satisfaction between the parties.

## II. Damages Calculation

¶ 40 Second, Traco argues that the trial court erred in calculating Comtrol's damages on both the UVSC Project and the Weber State Project because the trial court (1) used a national average of wages paid to construction workers rather than using the much lower wages and costs that Comtrol actually paid its employees to complete Traco's contractual work, (2) quashed Traco's subpoena of Comtrol's payroll records, and (3) awarded Comtrol lost profits in spite of Comtrol's anticipatory breach of both contracts. The trial court's calculation of damages is clearly fact sensitive. There was extensive testimony and documents that the trial court received and considered concerning the actual wages Comtrol paid its employees and the actual costs Comtrol paid to perform Traco's unfinished work. Traco has not marshaled this evidence.

¶ 41 "In order to challenge a court's factual findings, an appellant must first marshal all the evidence *in support of* the finding and then demonstrate that the evidence is legally insufficient to support the finding even when viewing it in a light most favorable to the court below." *Chen v. Stewart,* 2004 UT 82, ¶ 76, 100 P.3d 1177 (emphasis added) (internal quotation marks omitted); *see also* Utah R.App. P. 24(a)(9) ("A party challenging a fact finding must first marshal all record evidence that supports the challenged finding."). To fulfill its duty to marshal, Traco was required to "present, in comprehensive and fastidious order, every scrap of competent evidence introduced at trial which supports the very findings [it] resists." *Chen,* 2004 UT 82, ¶ 77, 100 P.3d 1177.

¶ 42 Instead of marshaling, Traco simply reasserts the evidence it presented to the trial court and asks this court to reconsider the weight and strength of that evidence. In fact, Traco's argument is "nothing but an attempt to have this court substitute its judgment for that of the trial court on a contested factual issue. This we cannot do." *Covey v. Covey,* 2003 UT App 380, ¶ 28, 80 P.3d 553 (internal quotation marks omitted).

---

1. We note that Traco's only explanation of the discrepancy was submitted in response to Comtrol's motion to strike Bronson's affidavit and in a deposition correction filed after the motion to strike. Traco does not explain the discrepancy on appeal, nor does it argue that the trial court erred in refusing to accept its explanation. Therefore, we do not address whether Traco offered a valid explanation for the discrepancy.

Traco's failure to marshal leaves Comtrol and this court "to bear the expense and time of performing the critical task of marshaling the evidence. This is unfair, inefficient, and unacceptable." *United Park City Mines Co. v. Stichting Mayflower Mountain Fonds,* 2006 UT 35, ¶ 26, 140 P.3d 1200.

¶ 43 Without marshaling the evidence supporting the trial court's calculation of damages, "we assume that the record supports the findings of the trial court." *Heber City Corp. v. Simpson,* 942 P.2d 307, 312 (Utah 1997) (internal quotation marks omitted). Therefore, we affirm the trial court's calculation of Comtrol's damages.

### III. Unrecoverable Change Orders

¶ 44 Third, Traco claims that the trial court erred when it concluded that Traco could not recover payment for work that it performed outside the scope of the original subcontract agreements, even though such work was approved by Comtrol's superintendent. Essentially, the trial court concluded that the contractual provisions requiring change orders to be submitted in writing and approved by specific Comtrol employees barred Traco's recovery for work that Traco performed outside the scope of both the UVSC and Weber State Agreements. This conclusion regarding certain provisions in the UVSC and Weber State Agreements is extremely fact-sensitive and relies on the trial court's specific findings of fact related to the actual language in the subcontract agreements, the circumstances surrounding Traco's submission of various change orders for additional work, the actual content of those change orders, and the agreement Traco had with other subcontractors to perform the additional work. Thus, because the "legal standard is extremely fact-sensitive, the appellant has the duty to marshal the evidence." *Chen,* 2004 UT 82, ¶ 76, 100 P.3d 1177.

¶ 45 Again, Traco failed to marshal the evidence supporting the trial court's conclusion. And, as with the previous issue, instead of marshaling, Traco "merely re-argue[s] the factual case [it] presented in the trial court." *Id.* ¶ 77. This "tactic of simply rearguing and recharacterizing the trial court's factual findings does not constitute

marshaling." *State v. Clark,* 2005 UT 75, ¶ 17, 124 P.3d 235. Therefore, because Traco did not satisfy the marshaling requirement here, we "affirm the [trial] court's findings on that basis alone," *Chen v. Stewart,* 2004 UT 82, ¶ 80, 100 P.3d 1177, and conclude that the trial court did not err in determining that Traco was barred from recovering for additional work it performed outside the scope of the UVSC and Weber State Agreements.

### IV. Subcontractor Lien Releases

¶ 46 Fourth, Traco argues that the trial court erred in finding that two interim lien waivers limited Traco's recovery: (1) the UVSC Release, which cut off claims for all labor and materials provided on or before April 30, 2001, and (2) the Weber State Release, which cut off claims for all labor and materials provided on or before August 31, 2001. The releases at issue here both state that Traco was releasing "all rights to . . . claims . . . for labor and materials furnished on or before [the release execution date]."

¶ 47 Traco claims that the releases are ambiguous because Traco's work was ongoing and residual payments were not payable at the time the releases were executed. Traco argues that the releases were based on a partial payment of the total contract. Essentially, Traco contends that the language in the releases refers only to contract work and not to change order work. We disagree.

¶ 48 Traco's interpretation of the releases is based entirely on parol evidence. However, the plain meaning of the releases is clear from the actual language contained within them. Each release, thus, is clear on its face. "If [a] contract is clear on its face, the trial court need not—and in fact should not—consider evidence of a contrary meaning." *Projects Unlimited, Inc. v. Copper State Thrift & Loan Co.,* 798 P.2d 738, 753 (Utah 1990) (holding that the trial court properly refused to consider parol evidence on the meaning of a lien release where language was unambiguous and susceptible to only one interpretation). We conclude that the plain language in both releases is unambiguous and affirm the trial court's determination that the UVSC Release and the Web-

er State Release effectively released all claims for work performed prior to the release execution dates.

## V. Attorney Fees

¶ 49 Finally, Traco argues that the trial court erred in awarding attorney fees because reversal on any of the issues raised in Traco's appeal would make Traco the prevailing party. However, because we affirm the trial court's rulings on every issue Traco raises on appeal, nothing changes regarding the factual scenario with which the trial court was faced when it determined that Comtrol was the prevailing party. Therefore, because Traco does not argue that the trial court's determination of the prevailing party was error under the original judgments in this case, we affirm the court's determination that Comtrol was the prevailing party, and uphold the its award of attorney fees.

## CONCLUSION

¶ 50 Traco claims that because issues of material fact exist regarding the Army Reserve Project, it was error for the trial court to award partial summary judgment in favor of Comtrol. However, any issues of material fact are created by Bronson's affidavit, which improperly contradicts his deposition testimony. Therefore, we do not consider Bronson's affidavit and affirm the trial court's grant of partial summary judgment.

¶ 51 Regarding Traco's claims that the trial court erred when it calculated Comtrol's damages and when it precluded Traco's recovery for various change orders, we conclude that Traco failed to meet the marshaling requirement. We further conclude that the UVSC Release and the Weber State Release were unambiguous and essentially released all claims for work performed prior to the releases' effective dates. Accordingly, we affirm.

¶ 52 Finally, because we affirm the trial court's findings and conclusions on all issues Traco raises on appeal, we also affirm the trial court's award of attorney fees to Comtrol.

¶ 53 I CONCUR: JAMES Z. DAVIS, Judge.

McHUGH, Judge (concurring in part and dissenting in part):

¶ 54 I join with the majority in Part I of its analysis, affirming the trial court's partial summary judgment in favor of Comtrol on the basis of accord and satisfaction. I also join in Parts III and IV of the majority opinion which address unrecoverable change orders and subcontractor lien releases. I respectfully dissent, however, from Part II of the majority's analysis. I believe that the trial court could not rely on only national averages, but rather, Comtrol was required to prove the actual amount it spent to finish Traco's subcontract work on the UVSC and Weber State projects. Furthermore, I conclude that the issue of whether average national hourly rates rather than evidence of the actual costs of completing the work could be used to prove Comtrol's damages is an issue of law. *See Bair v. Axiom Design, LLC,* 2001 UT 20, ¶ 13, 20 P.3d 388 ("[T]he determination of whether a party has made out a prima facie case is a question of law which we review for correctness, affording no deference to the trial court's judgment."). Consequently, I would not require Traco to marshal the evidence on this point. *See Wardley Better Homes & Gardens v. Cannon,* 2002 UT 99, ¶ 14, 61 P.3d 1009 ("Challenges to a trial court's legal determinations . . . do not require an appellant to marshal the evidence."); *see also Brigham Young Univ. v. Tremco Consultants, Inc.,* 2007 UT 17, ¶ 25, 156 P.3d 782.

¶ 55 To prove its damages, Comtrol relied on national cost data on the average wages paid to construction workers (National Construction Averages)[1] rather than on evidence of the amount it actually incurred to complete the projects. My first concern is that this approach is contrary to the express contract language governing the rights and obligations of Comtrol and Traco. The default

---

1. Comtrol introduced, over Traco's objection, the R.S. Means Company's Building Construction Cost Data. *See Building Construction Cost Data:* *2001 Western Edition* (Phillip R. Waier ed., 14th ed.2001).

provision of each subcontractor agreement states:

> In the event that Subcontractor appears likely to be unable to complete its work according to Contractor's project schedule, or if Subcontractor fails to fully perform its duties under this Subcontract ... then Contractor may (a) withhold payment ...; (b) after giving 48 hours written notice to Subcontractor, eject Subcontractor and take over Subcontractor's work and terminate Subcontractor's right to perform under the Subcontract. If Contractor takes over Subcontractor's work, the Contractor will charge Subcontractor *for all costs incurred as a result, including reasonable overhead and profit and including attorney's fees and other expenses.*

(Emphasis added.) The subcontract gives the contractor the right to charge the subcontractor for "all costs incurred as a result [of the subcontractor's nonperformance], including reasonable overhead" costs. I believe the meaning of "incurred" is unambiguous, limiting the contractor's damages to what it actually spent to finish the work. Therefore, Comtrol had the burden, as part of its case-in-chief, to provide the trial court with evidence of the actual costs incurred to finish Traco's work on the USVC and Weber State projects.

¶ 56 My second concern is that, notwithstanding this default provision in the subcontract, Utah case law requires the use of an "actual cost" measure of damages where one party completes the other party's performance under a construction contract. *See Darger v. Nielsen,* 605 P.2d 1223, 1225 (Utah 1979) ("The measure of damages for such a breach is the excess of the *cost of completing* [the other party's performance], over what defendant would have paid under the contract." (emphasis added)); *Stangl v. Todd,* 554 P.2d 1316, 1320 (Utah 1976) ("The contract breaker should pay the *cost of construction and completion* in accordance with his contract ...." (emphasis added)). In my view, the National Construction Averages are

irrelevant, unless offered to challenge or establish the reasonableness of the wages paid by Comtrol.[2] As long as a party "present[s] a prima facie case of its damages, and [the other party] d[oes] not present evidence that [those] charges were unreasonable, or that ... [the project could have been] finished at a lower price," that party is entitled to receive the *actual cost of completion. Darger,* 605 P.2d at 1225. This court has also explained that the purpose of awarding damages is to fully compensate a party "for *actual losses incurred* by evaluating any loss 'suffered by the *most direct, practical and accurate method* that can be employed.'" *Price–Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.,* 784 P.2d 475, 478 (Utah Ct. App.1989) (emphasis added) (citation omitted) (quoting *Even Odds, Inc. v. Nielson,* 22 Utah 2d 49, 448 P.2d 709, 711 (1968)).

¶ 57 Likewise, I find Comtrol's reliance on *Kilpatrick v. Wiley, Rein & Fielding,* 2001 UT 107, 37 P.3d 1130, and *Terry v. Panek,* 631 P.2d 896 (Utah 1981), unpersuasive. *Kilpatrick* dealt with a new business's lost profits. *See* 2001 UT 107, ¶¶ 69–70, 76–77, 37 P.3d 1130. The *Kilpatrick* court allowed evidence of a "hypothetical stream of profits," *id.* ¶ 70, because an actual record was not available. *See id.* ¶ 76 ("While start-up businesses, such as [this one], *lack an actual record* of past earnings, which decreases 'the certainty with which one could predict future profits[,] ... that fact should not automatically preclude new businesses from recovering lost profits ....'" (emphasis added) (second alteration and omissions in original) (quoting *Cook Assocs., Inc. v. Warnick,* 664 P.2d 1161, 1166 (Utah 1983))). Similarly, the damages in *Terry* related to the estimated value of a nonexistent well that was promised by the sellers in a real estate transaction. *See* 631 P.2d at 897 & nn. 1–2. The *Terry* court allowed the buyer to testify as to the seller's previous rough estimates of the value of the well because only such "sparse" evi-

---

**2.** The trial court attempted to determine "a reasonable fair market value amount to complete Traco's work," finding "that Comtrol's claimed back charges to complete Traco's work ... [were] overstated" and "excessive." Although

the trial court correctly considered the reasonableness of Comtrol's back charges, it should have started its inquiry with the costs that Comtrol actually incurred rather than with the National Construction Averages.

dence was available. *Id.* at 898.[3]

¶ 58 A plaintiff "need only [prove damages] with reasonable certainty rather than with absolute precision." *Price–Orem Inv. Co.,* 784 P.2d at 478. However, in a case such as this, where the costs have already been incurred, Comtrol should have provided the best records available to prove the actual costs it incurred in completing Traco's work. *See, e.g., Mahmood v. Ross,* 1999 UT 104, ¶ 19, 990 P.2d 933 ("[L]egal damages serve the important purpose of compensating an injured party for *actual injury sustained,* so that [it] may be restored, as nearly as possible, to the position [it] was in prior to the injury." (internal quotation marks omitted) (emphasis added)); *Highland Constr. Co. v. Union Pac. R.R.,* 683 P.2d 1042, 1045 (Utah 1984) ("[D]amage[s] must be established by substantial evidence and not by conjecture .... [and] *must be traceable to the wrongs complained of.*" (citations omitted) (emphasis added)). Therefore, I would hold that the trial court erred by relying on evidence of 2001 National Construction Averages to calculate Comtrol's damages.

¶ 59 Based on the foregoing, I would remand for further proceedings on the issue of damages to determine whether Comtrol has met its burden, with testimony and documents related specifically to these projects,[4] to prove its damages with "reasonable certainty rather than with absolute precision." *Price–Orem Inv. Co.,* 784 P.2d at 478. Until the trial court makes further findings on damages, unrelated to the National Construction Averages, the determination of the prevailing party is uncertain. Therefore, I also dissent from the majority's decision as it relates to the award of attorney fees.

---

**3.** The decisions from other jurisdictions relied upon by Comtrol are also distinguishable. *See ABT Bldg. Prods. Corp. v. National Union Fire Ins. Co.,* 472 F.3d 99, 109 & n. 13 (4th Cir.2006) (noting that the class action settlement agreement expressly adopted a formula using National Construction Averages to calculate damages); *Nationwide Mut. Fire Ins. Co. v. Tomlin,* 181 Ga.App. 413, 352 S.E.2d 612, 616–17 (1986) (determining evidence that included National Construction Averages was sufficient to distinguish between recoverable and non-recoverable damages caused by a drop in house's foundation); *Carlisle Corp. v. Medical City Dallas, Ltd.,*

196 S.W.3d 855, 865, 867 (Tex.App.2006) (noting that where evidence included actual costs incurred to replace roof, National Construction Averages were properly used to establish that costs were reasonable), *cert. granted,* No. 06–0660, 2007 Tex. LEXIS 407 (May 4, 2007).

**4.** Traco challenges the trial court's order quashing its subpoenas, served on Comtrol during trial, which sought records of the actual hourly wages paid by Comtrol. Because I would hold that it was Comtrol's obligation to introduce those records, I would not reach this issue.