IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Peterson Hunting, | ) | OPINION |
| | ) | |
| Petitioner, | ) | Case No. 20100577-CA |
| | ) | |
| v. | ) | |
| | ) | F I L E D |
| Labor Commission and Nicholas Jay | ) | (January 20, 2012) |
| Frohardt, | ) | |
| | ) | 2012 UT App 14 |
| Respondents. | ) | |

-----

Original Proceeding in this Court

Attorneys:   Mark D. Dean and Kristy L. Bertelsen, Salt Lake City, for Petitioner
C. Richard Henriksen Jr.; Robert M. Henriksen; and Keith L. Johnson,
Salt Lake City, for Respondent Nicholas Jay Frohardt
Alan L. Hennebold, Salt Lake City, for Respondent Labor Commission

-----

Before Judges McHugh, Voros, and Roth.

McHUGH, Presiding Judge:

¶1     Kurtley Peterson, doing business as Peterson Hunting, petitions for review of the
Labor Commission's (the Commission) determination that he is not exempt from
compliance with the Workers' Compensation Act as an agricultural employer.[1] *See*

---

[1]The record reflects that Peterson Hunting is not a legal business entity.
Nevertheless, the Commission lists Peterson Hunting, rather than Kurtley Peterson, as

(continued...)

Utah Code Ann. §§ 34A-2-101 to -1005 (2011) (Workers' Compensation Act); *id.* § 34A-2-103(5) (providing an exemption from the Workers' Compensation Act for agricultural employers).[2] According to Peterson, he is an agricultural employer because he uses agricultural labor in the form of feeding, harvesting, and managing wildlife and livestock, *see id.* § 35A-4-206(1)(a) (defining agricultural labor), and his payroll for nonimmediate family members is less than $8,000 per year. *See id.* § 34A-2-103(5)(c)(i) (providing that an agricultural employer's payroll may not exceed $8,000 to nonimmediate family members). We decline to disturb the Commission's order.

BACKGROUND

¶2     Nicholas Jay Frohardt worked as a hunting guide for Peterson from August 12, 2007, to October 3, 2007, and again during the 2008 hunting season until he was injured on the job in September of that year. According to Frohardt, his duties included guiding hunters, preparing and cleaning up after their meals, setting and breaking campsites, feeding and caring for Peterson's mules and horses, pumping water to the camp, chopping firewood, and generally making the hunters' experience as pleasant as possible.

¶3     Peterson "is in the business of guiding sportsmen on hunting expeditions on Boobe Hole [M]ountain," near Richfield, Utah. Boobe Hole Mountain is located on property owned by Tim Anderson and R.J. Rickenbaugh. Peterson conducts the hunting operations on Anderson's portion of Boobe Hole Mountain, consisting of 3,000 acres (the Land). Anderson testified that there are no farming operations on the Land and that it is used only as a range for his family's 135 head of cattle. Although Anderson had no personal involvement in the day-to-day hunting operations, he shared the profits equally with Peterson in exchange for allowing the hunting expeditions on the Land.

---

[1](...continued)
the party to the agency proceeding. Although we maintain the reference to Peterson Hunting in the caption for continuity purposes, we treat Kurtley Peterson as the petitioner in the body of the decision.

[2]Because the material provisions of the statute have not changed, we cite the current version of the Utah Code for the convenience of the reader.

¶4 Peterson uses mules and horses to transport hunters and to carry supplies and game on the Land. To ensure that the animals had an adequate supply of water, Frohardt constructed an irrigation pipe from a natural spring to a hunting camp on the Land. Cattle, deer, and elk also use this water source.

¶5 To obtain deer and elk tags to resell to the hunters each year, Peterson petitioned the Utah Division of Wildlife Resources (UDWR) to create a Cooperative Wildlife Management Unit. Each year the UDWR sent a biologist to the Land to meet with Peterson and to determine the number of deer and elk tags that could be sold. In 2007 and 2008, UDWR gave Peterson fourteen bull elk tags and eighteen buck tags. Additional tags for hunting in the unit are made available to the general public. The UDWR provided the tags to Peterson at no cost in exchange for the right of the public to hunt on the privately-owned Land.

¶6 Peterson testified that he and his employees "encouraged hunters to shoot deer and elk with nonmatching points so that bucks and bull elk with matching points could continue to produce and pass on their matching point genetic lines." However, he admitted that "hunters were not required to shoot the bucks/bull elk" that Peterson encouraged them to shoot.

¶7 In 2007, Peterson paid Frohardt $4,765.19 for his services and paid another employee $3,000. Peterson also gave Frohardt $500, which Peterson claims was for company expenses. While Frohardt did use $50 for company supplies, he denies that Peterson instructed him to do so and contends that he was allowed to retain the remaining $450 for his personal use. In contrast, Peterson claimed that he instructed Frohardt to keep the remaining $450 for future expenses related to the hunting operation. There were no further business expenses paid by Frohardt, and Peterson never requested that Frohardt return the $450 balance.

¶8 On September 18, 2008, a hunter Frohardt was guiding accidentally shot him, inflicting a "wound the size of a small cannon ball five inches in diameter" near the front of Frohardt's right ankle and his right heel. As a result, Frohardt underwent two surgeries and ultimately had his right leg amputated below the knee. Frohardt now uses a prosthetic limb, and due to his active lifestyle, the sockets for this prosthetic have been replaced six times. Frohardt may also require hip surgery in the future due to the additional strain "his left leg endures to balance . . . the prosthetic right leg."

¶9 Frohardt filed a claim for workers' compensation benefits with the Commission on June 9, 2009. Peterson argued that he was exempt from providing workers' compensation benefits because he was an agricultural employer that paid less than $8,000 to nonimmediate family employees in 2007 and 2008. *See* Utah Code Ann. § 34A-2-103(5)(c)(i) (2011). Peterson supported this argument by claiming that Frohardt's labor was agricultural under Utah Code section 35A-4-206, because it included the feeding, harvesting, and managing of wildlife and livestock. *See id.* § 35A-4-206(1)(a).

¶10 The Administrative Law Judge (ALJ) issued her "Findings of Fact, Conclusions of Law, and Order" on February 9, 2010. The ALJ first found that the $450 given to Frohardt by Peterson was part of his wages. Accordingly, the ALJ concluded that even if Peterson was an agricultural employer, his total payroll for 2007 exceeded $8,000 and, therefore, he would not be exempt from providing workers' compensation benefits. Additionally, assuming that Peterson did not exceed the $8,000 payroll threshold, the ALJ determined that he was not an agricultural employer because his hunting operations did not involve the feeding, raising, caring for, or management of wildlife. In reaching this decision, the ALJ rejected Peterson's argument that killing elk and deer fed Anderson's cattle by leaving more vegetation for their consumption, finding that the small number of animals killed by Peterson's hunters made no significant difference in the overall deer and elk populations. Additionally, the ALJ concluded that Peterson did not manage the deer and elk herd because even though hunters were encouraged to shoot animals with mismatched points, they were not required to do so.

¶11 Peterson filed a motion for review of the ALJ's decision with the Commission. Relying on the facts found by the ALJ, the Commission affirmed the decision and explained that Peterson merely "provided a guide to individuals seeking to hunt deer and elk. There is no indication that Peterson actually raised, fed or cared for the deer and elk to be hunted . . . ." Having decided that Peterson was not an agricultural employer, the Commission did not reach the issue of whether his payroll exceeded $8,000. Peterson now appeals.


ISSUES AND STANDARDS OF REVIEW

¶12 On petition for review, Peterson argues that the Commission erred in determining that he was not an Agricultural Employer under Utah Code section 34A-2-103(5)(a)(i)(A). *See* Utah Code Ann. § 34A-2-103(5)(a)(i)(A). We review the

Commission's conclusions of law for correctness. *See Esquivel v. Labor Comm'n*, 2000 UT 66, ¶ 13, 7 P.3d 777; *Strate v. Labor Comm'n*, 2006 UT App 179, ¶ 13, 136 P.3d 1273 ("We review the Commission's interpretations of law under a correction-of-error standard."). However, the legislature has granted the Commission considerable discretion in applying the law to the facts of a case, and whether the Commission correctly applied the law "is a mixed question of law and fact reviewed for reasonableness and rationality." *See Acosta v. Labor Comm'n*, 2002 UT App 67, ¶ 11, 44 P.3d 819; *see also* Utah Code Ann. § 34A-1-301 (2011) ("The commission has the duty and the full power, jurisdiction, and authority to determine the facts and apply the law in this chapter or any other title or chapter it administers."). Further, we will uphold the Commission's findings of fact as long as "they are supported by substantial evidence when viewed in the light of the whole record." *See Acosta*, 2002 UT App 67, ¶ 29 (internal quotation marks omitted). "Substantial evidence is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Smith v. Workforce Appeals Bd.*, 2011 UT App 68, ¶ 9, 252 P.3d 372 (internal quotation marks omitted). In challenging the Commission's factual findings, the challenging party is required to "marshal all of the evidence supporting the findings and show that despite the supporting facts, and in light of the conflicting or contradictory evidence, the findings are not supported by substantial evidence." *See Viktron/Lika v. Labor Comm'n*, 2001 UT App 394, ¶ 5, 38 P.3d 993.

¶13    Peterson also argues that if we determine he is an agricultural employer, we should remand to the Commission to determine whether his annual payroll for nonimmediate family members exceeded $8,000 under Utah Code section 34A-2-103(5)(c)(i). *See* Utah Code Ann. § 34A-2-103(5)(c)(i). We will only disturb an administrative agency's findings of fact "if the findings are not supported by substantial evidence." *See Smith*, 2011 UT App 68, ¶ 9 (internal quotation marks omitted).


ANALYSIS

¶14    Peterson argues that the Commission erred in determining that he is not exempt from providing employees with workers' compensation insurance. Specifically, Peterson argues that he qualifies for the "agricultural employer" exemption provided in Utah Code section 34A-2-103(5). *See* Utah Code Ann. § 34A-2-103(5)(a)(i)(A) (2011). That section provides that an agricultural employer is "a person who employs agricultural labor as defined in [Utah Code section] 35A-4-206(1)." *Id.* In turn,

"[a]gricultural labor" is defined as "remunerated service performed . . . on a farm, in the employ of any person in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife." *Id.* § 35A-4-206(1)(a). The Utah Administrative Code[3] further elaborates that

> [a]gricultural labor includes services performed on a farm by a worker for any person in connection with any of the following activities: (i) The cultivation of the soil; (ii) The raising, shearing, feeding, caring for, training, or management of livestock, bees, poultry, fur-bearing animals, or wildlife; or (iii) The raising or harvesting of any other agricultural or horticultural commodity.

*See* Utah Admin Code R994-206-101(2)(a)(i)-(iii). Peterson argues that the Commission erred in determining that his hunting business did not include the feeding, harvesting, or management of wildlife or livestock.

## I. Peterson Failed to Marshal the Evidence

¶15    Before considering Peterson's argument on this issue, we address the marshaling requirement of rule 24(a)(9) of the Utah Rules of Appellate Procedure. *See* Utah R. App. P. 24(a)(9). Under rule 24(a)(9), "A party challenging a fact finding must first marshal all record evidence that supports the challenged finding." *Id.*; *see also Martinez v. Media Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶ 17, 164 P.3d 384 (recognizing that the marshaling obligation applies to agency decisions). A party satisfies the marshaling requirement by presenting "'all of the evidence supporting the findings and show[ing] that despite the supporting facts, and in light of the conflicting or contradictory evidence, the findings are not supported by substantial evidence.'" *Martinez*, 2007 UT 42, ¶ 17 (quoting *Grace Drilling Co. v. Board of Review*, 776 P.2d 63, 68 (Utah Ct. App. 1989)). "The process of marshaling is thus fundamentally different from that of presenting the evidence at trial. The challenging party must temporarily remove its own prejudices and fully embrace the adversary's position; he or she must play the

---

[3]Although both parties brought this regulation to the Commission's attention, the Commission did not mention it in its decision.

devil's advocate." *Chen v. Stewart*, 2004 UT 82, ¶ 78, 100 P.3d 1177 (internal quotation marks omitted). This rule applies even if the issue before the court is a mixed question of law and fact. *See United Park City Mines Co. v. Stichting Mayflower Mountain Fonds*, 2006 UT 35, ¶ 25, 140 P.3d 1200 ("Even where the defendants purport to challenge only the legal ruling, as here, if a determination of the correctness of a court's application of a legal standard is extremely fact-sensitive, the [appellants] also have a duty to marshal the evidence." (alteration in original) (internal quotation marks omitted)). If a party fails to satisfy the marshaling requirement, this court may, in its discretion, assume that the record supports the factual findings of the agency. *See Martinez*, 2007 UT 42, ¶¶ 18, 19.

¶16    In this case, the agency made findings of fact and applied the law to those facts. Thus, our review is a mixed question of law and fact that required Peterson to marshal the evidence. *See United Park City Mines*, 2006 UT 35, ¶ 25. "[Peterson] cannot dodge this duty by attempting to frame the issues as legal ones."[4] *See id.* Peterson has failed to set forth the evidence in the record that supports the findings of fact in the ALJ's decision. For the most part, Peterson's brief presents only the evidence favorable to his position and fails to "remove [his] own prejudices and fully embrace [Frohardt's] position." *Chen*, 2004 UT 82, ¶ 78 (internal quotation marks omitted). Nonetheless, we exercise our discretion to consider "the whole record and determine if the decision below has adequate factual support." *Martinez*, 2007 UT 42, ¶ 20.

## II. The Findings of Fact Are Supported by Substantial Evidence and the Commission's Decision Does Not Exceed the Bounds of Reasonableness and Rationality

¶17    First, Peterson argues that his operations included the feeding of wildlife and cattle on the Land. In support, Peterson argues that he and his employees constructed a water line to water troughs and distributed salt licks. Peterson also claims that by hunting wildlife he "in essence assisted in the feeding of the cattle by ensuring that enough food remained on the land for the livestock." However, the evidence offered in support of Peterson's assertions is unpersuasive. Instead, the evidence shows that the water troughs were built for the purpose of watering mules and horses used in Peterson's hunting operations and that any benefit to Anderson's cattle and the wildlife

---

[4]Peterson claims that he had no obligation to marshal the evidence by asserting that the Commission's order "involves a question of law (rather than fact)" and that "there is no need to marshal that evidence."

was simply ancillary. Although Peterson testified that he provided the salt licks and water for the cattle, Anderson, the owner of the cattle, said that he had never "talked to [Peterson] about watching over the cattle or working with the cattle in any way." Indeed, Peterson admitted that the "elk just love[d]" the salt licks, and counsel for Peterson admitted at oral argument that the salt licks served as a lure to gather the elk and deer in a known location as a convenience for hunting. It is also significant that Frohardt testified that he did not do anything for the cattle while employed by Peterson. In addition, although Peterson argued that hunting wildlife ensured the cattle had adequate feed, the ALJ concluded, and the Commission agreed, that this "would not make a significant difference in the vegetation available to [the] cattle" because Peterson's hunters killed only "2.8% (14 of 500 elk) of the elk population and 12% (18 of 150 deer) of the deer population (per year)." Considering the record as a whole, we conclude that the finding that Peterson did not feed the cattle or wildlife is supported by substantial evidence.

¶18    Second, Peterson argues that his hunting operations were engaged in harvesting wildlife. However, rule 994-206-101 of the Utah Administrative Code provides that "[h]arvesting includes picking, cutting, threshing, shucking corn, baling hay, and hulling nuts." *See* Utah Admin Code R994-206-101. Peterson does not address the rule and fails to respond to Frohardt's argument that Peterson's operations do not fit within its narrow definition of harvesting. Our review of the record convinces us that Peterson's operations cannot be considered harvesting as defined by administrative rule 994-206-101. Accordingly, the Commission's finding that Peterson was not engaged in harvesting is supported by substantial evidence.

¶19    Finally, Peterson argues that he was involved in the management of livestock and wildlife because he met with Utah's Cooperative Wildlife Management Unit "to decide how many animals, including elk and deer, need[ed] to be killed and harvested to ensure proper ratios and to guarantee that there was enough food on the [Land] for other cattle." However, the ALJ's findings of fact indicate that it was the biologists from the UDWR who actually "determine[d] how many deer and elk tags could be sold," and that finding is supported by the evidence. Peterson also argues that he assisted in management by encouraging hunters "to shoot only certain wildlife to allow for selective breeding." However, the record indicates that Peterson and his guides never required hunters to shoot any particular animal, thereby substantially supporting the ALJ's finding that "[Peterson] did not manage genetic lines as much as encourage them."

¶20    Additionally, there is no indication that Frohardt, the alleged agricultural laborer in this case, performed services that were intended to do anything other than guide recreational hunters.  Based on the record as a whole, we cannot conclude that the factual findings were unsupported by the record or that the Commission's decision was unreasonable or irrational.  Accordingly, Peterson is not exempt from compliance with the Workers' Compensation Act and must provide benefits to Frohardt.[5]


CONCLUSION

¶21    Peterson is required to provide workers' compensation benefits to Frohardt because his recreational hunting operations do not include feeding, harvesting, or management of wildlife, and therefore, he is not an agricultural employer.  Accordingly, we decline to disturb the decision of the Commission.


_____
Carolyn B. McHugh,
Presiding Judge


-----

¶22    WE CONCUR:


_____
J. Frederic Voros Jr.,
Associate Presiding Judge


_____
Stephen L. Roth, Judge

---

[5]Because we conclude that Peterson is not an agricultural employer, we need not reach the issue of whether Peterson's payroll exceeded $8,000 to nonimmediate family members in 2007.