**2024 UT App 170**

## THE UTAH COURT OF APPEALS

C.R. ENGLAND INC. AND INDEMNITY INSURANCE COMPANY OF
NORTH AMERICA,
Petitioners,
*v.*
LABOR COMMISSION AND JEZIAH JOHNSON,
Respondents.

Opinion
No. 20230818-CA
Filed November 15, 2024

Original Proceeding in this Court

Christin Bechmann and Clarissa West,
Attorneys for Petitioners

Richard R. Burke, Attorney for Respondent
Jeziah Johnson

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1     Jeziah Johnson, a long-haul truck driver, was injured when his truck—then being driven by his co-driver—was in a rollover accident while traveling at 65 miles per hour. At the time of the accident, Johnson was resting in the truck's sleeper berth. He filed a claim for workers' compensation benefits, and he was eventually awarded temporary total disability benefits, treatment expenses, and travel reimbursement expenses. His employer, C.R. England (England), and its insurer (collectively, the Company) seek judicial review of the award, asserting chiefly that the evidence presented does not sufficiently support it. We decline to disturb the award and, in addition, we award Johnson his

attorney fees and costs incurred in defending against the Company's claims in this review proceeding.

BACKGROUND

¶2     In September 2019, Johnson was offered employment with England, a commercial trucking company. The offer was conditioned on Johnson obtaining his commercial driver license (CDL) via England's driver tuition reimbursement program. Prior to his employment with England, Johnson had experienced mental health issues, including mood disorder, post-traumatic stress disorder, and anxiety. However, during Johnson's training period, a medical examiner found Johnson mentally and physically fit to work as a commercial truck driver. After obtaining his CDL and passing all examinations, Johnson began driving for England in early October 2019.

¶3     About eleven weeks later, on December 21, 2019, Johnson and a co-driver were taking turns driving an England truck through New Mexico when an accident (the Accident) occurred. At the time of the Accident, Johnson's co-driver was driving the truck and Johnson was resting in the truck's sleeper berth. The berth had a safety net that was designed to restrain a passenger in the event of an accident, but the safety net was not functioning properly at the time, despite Johnson having made multiple previous requests to have England repair it. The Accident occurred while the truck was traveling at approximately 65 miles per hour; another vehicle apparently failed to yield the right-of-way, causing the truck to swerve, run off the road, and roll over. Photos from the scene of the Accident show significant damage to the truck: the hood was completely torn off of the body, the front axle was displaced, and the windshield was heavily damaged.

¶4     Following the Accident, Johnson was transported via ambulance to a local hospital. Johnson reported to emergency department personnel that he had been "rolling around" in the

sleeper berth during the Accident but that he was unsure if he had hit his head. He also reported experiencing low back pain. Johnson was discharged from the emergency department with instructions to follow up with his private physician for his injuries, including an "unspecified" head injury.

¶5     A few days after the Accident, when he was back home, Johnson went to the emergency department complaining of "rib pain." After conducting an exam—including a CT scan of his head and neck, the findings of which were unremarkable—the emergency physician diagnosed Johnson with a "concussion without loss of consciousness." Johnson also visited an occupational medicine clinic, where the provider noted, as relevant here, a concussion, an eyebrow laceration, and back pain.

¶6     Later, in January 2020, Johnson suffered a fall at home, and he reported that it resulted in "severe pain." He again went to the emergency department, and after additional CT scans, the emergency physician noted "healing" fractures of three ribs and "healing" fractures of the spine. During a follow-up visit, a different physician opined that the "fractures are from the motor vehicle accident/work injury."

¶7     And in January 2021, Johnson visited a neurologist, who noted that Johnson complained of "constant, daily headaches" and that Johnson believed the headache symptoms had "flared up" his anxiety and depression. The neurologist diagnosed Johnson with post-concussion syndrome, post-traumatic headache, and "[e]xacerbation of underlying mood disorder" and of "anxiety [and] depression." In particular, the neurologist concluded that the headaches and exacerbation of psychological symptoms were "due to the work injury on 12/21/2019." And the neurologist indicated that all of his conclusions were "made within a reasonable degree of medical certainty."

¶8     In all, Johnson was evaluated by a variety of treating health care professionals who noted that Johnson was suffering from

persistent headaches and from psychological issues such as anxiety and depression. In particular, treating providers assessed Johnson for ongoing nightmares and flashbacks, anger issues, and "daily headaches." In this vein, one psychologist remarked that Johnson's "cognitive symptoms are due to emotional distress, somatic focus, and stressors that have increased since the injury."

¶9     In addition to his own treating physicians and other health care professionals, Johnson was examined by two medical experts retained by the Company: an orthopedic surgeon and a physiatrist.[1] The orthopedic surgeon, after writing that Johnson

---

1. The Company refers to the examinations rendered by its retained medical experts as "independent medical examinations" or "IMEs," and the administrative law judge unfortunately adopted the use of this term in his written findings. This term is an outdated one that was formerly used to refer to examinations conducted pursuant to rule 35 of the Utah Rules of Civil Procedure. *See, e.g.*, *Astill v. Clark*, 956 P.2d 1081, 1088 (Utah Ct. App. 1998) (discussing and referring to a rule 35 examination as an "independent medical examination" or an "IME"). But the advisory committee's note to the current version of rule 35—which applies in labor commission cases, to the extent that labor commission rules do not contradict it, *see Barker v. Labor Comm'n*, 2023 UT App 31, ¶ 11, 528 P.3d 1260, *cert. denied*, 534 P.3d 751 (Utah 2023)—makes clear that such examinations should no longer be referred to as IMEs. Utah R. Civ. P. 35 advisory committee's note ("The parties and the trial court should refrain from the use of the phrase 'independent medical examiner,' using instead the neutral appellation 'medical examiner,' 'Rule 35 examiner,' or the like."); *see also Stage Dep't Store v. Magnuson*, 2024 UT App 85, ¶¶ 44–45, 552 P.3d 288 (discussing these issues in a labor commission case, and noting that rule 35 examinations are "far from independent due to the conflict of interest arising between the medical examiners and the insurance companies

(continued…)

"had not yet secured the safety harness" in the sleeper berth before the Accident occurred, concluded that Johnson's rib and lumbar fractures were not related to the Accident, that the only injuries that *were* related to the Accident were a back strain/sprain and an eyebrow laceration, and that Johnson was capable of returning to work full-time without restrictions. And the physiatrist concluded that Johnson had sustained a concussion, an eyebrow laceration, and a lumbar strain/sprain in the Accident, but that all of these injuries were "resolved" and Johnson could return to work full-time without restrictions.

¶10 After reviewing the reports from the Company's medical experts, Johnson obtained a sworn declaration from the neurologist who had examined him in January 2021. In that declaration, the neurologist opined, among other things, that Johnson was experiencing "anxiety and depression that were directly caused by the [A]ccident," and that all of Johnson's "medical care to date ha[d] been necessitated by the [A]ccident," including treatment for "resulting symptoms from his concussion and spinal injuries, along with psychological issues from the [A]ccident." The neurologist indicated that he had reviewed the reports from the Company's medical experts, and he offered a response, in relevant part, as follows:

> I have observed Mr. Johnson in my clinic over the past year, including before and after [the Company's expert] evaluations were performed. It is not evident to me what facts these doctors relied on to reach their conclusions that [Johnson] had

paying their bills"). To its credit, the Labor Commission Appeals Board correctly refrained from referring to the Company's retained experts as "independent" medical examiners, instead calling them simply "CR England's medical consultants." In this opinion, we similarly refer to them as "the Company's medical experts" or something similar.

already fully recovered from the [A]ccident. Suffice it to say, based on my longitudinal observations of Mr. Johnson in a clinical setting, I do not believe that he is medically stable at this time. Mr. Johnson needs additional care in the form of ongoing neurological care with necessary medicines, continued psychological counseling and physical therapy.

¶11   In September 2021, Johnson filed an application for a hearing with the Utah Labor Commission, asserting that he had sustained injuries in the Accident, including a traumatic brain injury, broken ribs, and a back injury, and he requested an award of medical expenses, temporary total disability compensation, permanent partial disability compensation, travel expenses, and unpaid interest. The case was assigned to an administrative law judge (ALJ), who held a hearing in April 2022.

¶12   At that hearing, Johnson testified that, as the truck rolled over during the Accident, he was "thrown around" inside the sleeper berth and that he struck his head, back, neck, legs, and shoulders against the bunk, cabinets, and walls of the truck. Johnson stated that, at the time of the hearing, he was still experiencing headaches with pain of "3 or 4 out of 10," which lasted four to five hours at a time and occurred six days per week, along with various other types of headaches, including migraines, occurring at varying frequencies. Johnson indicated that he was experiencing "daily" cognitive difficulties that made him feel like he was in a "mental fog," as well as vision problems along with light and noise sensitivity. Additionally, Johnson stated that he had been, and still was, seeking therapeutic counseling services.

¶13   Johnson also testified about his mental health both before and after the Accident. He acknowledged that he had long experienced mental health issues, but he testified that his symptoms had been "well controlled" before applying to work for

England. He offered his view that, since the Accident, his anxiety and depression had worsened.

¶14   After the hearing, and given the conflicting medical evidence, the ALJ referred the matter to a medical panel. A few months later, the panel issued a report, and it concluded, as relevant here, that Johnson's headaches were a result of the Accident and that his "psychiatric illness . . . ha[d] worsened from the industrial accident." The panel noted that Johnson smoked "3-4 bowls a day of 31% THC flower" cannabis—an amount it characterized as "high"—and it observed that smoking that much cannabis "is known to worsen anxiety, mood disorders, and overall health, and may be contributing to current symptoms." But the panel nevertheless concluded that Johnson's headaches and worsened psychological symptoms were caused by the Accident, and that he had not yet reached medical stability either "regarding his headaches" or "from a psychiatric standpoint."

¶15   The Company objected to the medical panel report, and it asked the ALJ to decline to accept the report into evidence and to appoint a new medical panel. In particular, the Company argued that the panel's opinions were contradictory and were not made to a reasonable degree of probability. The Company was especially critical of the panel's discussion of Johnson's cannabis use, and it characterized the panel's report as confusing and contradictory because the report identified two potential causes—the Accident and the cannabis use—of Johnson's symptoms.

¶16   After considering the Company's objection, the ALJ referred the case back to the medical panel to answer follow-up questions regarding Johnson's cannabis use. In particular, the ALJ asked the panel whether Johnson's cannabis use had worsened his psychiatric symptoms and, if so, to "discuss that worsening in comparison to" the effect that the Accident "ha[d] had in worsening" those same symptoms.

¶17   In response, the panel issued an addendum to its report, and in that addendum the panel indicated that Johnson's high cannabis use was indeed "worsening his premorbid psychiatric illness." The panel was, however, "unable to quantify the 'worsening,'" but it "guess[ed]" that Johnson's cannabis use had worsened his symptoms by "a significant amount," because "[t]he amount of cannabis [Johnson was] consuming a day [was] a lot." In the end, though, the panel found that Johnson's cannabis use "cannot fully explain the onset or course of his persistent psychiatric symptoms," and it therefore concluded that the cannabis use was "an aggravating factor, rather than an explanatory factor." In short, the panel determined that the Accident and the cannabis use had *both* contributed to the worsening of Johnson's psychiatric issues, stating that the Accident "did initially worsen" those symptoms but that Johnson's "chronic high dose" of cannabis "has further exacerbated his condition."

¶18   Following issuance of the medical panel's addendum, it was Johnson who objected, claiming that the conclusions the panel reached in the addendum were "speculative and lacked both evidentiary and scientific foundation," and he asked the ALJ to decline to accept the addendum. The record submitted to us does not contain any formal ruling by the ALJ on Johnson's objection, but the objection was at least implicitly overruled, because the ALJ discussed the addendum in its eventual ruling.

¶19   Later, after reviewing the medical panel's submissions and considering all the evidence, the ALJ issued its Findings of Fact, Conclusions of Law, and Order. In making its decision, the ALJ considered evidence from a number of sources, including the facts of the Accident itself, testimony from the hearing, treating providers' notes, medical records, the medical panel reports, and the Company's expert reports. As relevant here, the ALJ concluded that the Accident "caused [Johnson's] headaches and exacerbated his pre-existing psychiatric conditions." The ALJ

awarded Johnson "historical and recommended future medical expenses," temporary total disability compensation on an ongoing and historical basis (including a 15% weekly wage increase due to England's "willful failure to repair the restraint system" in the truck), and travel expenses.

¶20 After the ALJ issued its ruling, the Company asked the Labor Commission's Appeals Board (the Commission) to review the ALJ's ruling. In its motion for review, the Company claimed, among other things, that the medical panel's initial report should not have been admitted into evidence and that the ALJ's ultimate determination regarding medical causation was unsupported by the evidence. In his response to the Company's motion for review, Johnson claimed that he had "ceased his cannabis use" after receiving the initial report from the medical panel, but that he still had "continued depression [and] anxiety." And in its reply in support of its motion, the Company asked the Commission—in light of this new representation from Johnson about cessation of cannabis use—to remand the case to the ALJ so that the ALJ could send the matter to the medical panel for a third time.

¶21 A few months later, the Commission affirmed the ALJ's decision, and it did so without making any mention of the Company's request for a third medical panel review. It adopted the ALJ's findings of fact in their entirety, and it provided its own "summary" of those factual findings. In discussing medical causation, the Commission noted that "the appropriate inquiry is whether the work accident contributed in any degree to the injured worker's current condition for which compensation is sought." And given that there was plenty of evidence supporting the notion that the Accident was at least *a* cause (even if not the *only* cause) of Johnson's headaches and worsened psychological symptoms, the Commission concluded that Johnson had shown medical causation. In particular, the Commission found "the panel's opinion on this point to be persuasive," "well-reasoned," and "supported by" the opinions of several of the treating health

care professionals, including the neurologist. The Commission expressly rejected the Company's assertion that the panel's opinion on medical causation was contradictory and "not made to a reasonable degree of medical probability." Thus, the Commission affirmed the ALJ's ruling in all respects.

ISSUES AND STANDARDS OF REVIEW

¶22 The Company now seeks judicial review of the Commission's decision, and it presents two issues for our review. First, it claims that the Commission's medical causation determination is not sufficiently supported by the evidence presented. "[W]hether the Commission properly found that medical causation exists is a question of fact we review for substantial evidence." *YESCO v. Labor Comm'n*, 2021 UT App 96, ¶ 13, 497 P.3d 839. We discuss the parameters of the "substantial evidence" standard of review more fully below, but in summary, this standard requires that "we defer to the agency if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Id.* (quotation simplified).

¶23 Second, the Company asserts that the Commission should have referred the case to the medical panel for a third time to re-evaluate Johnson after he claimed he ceased using cannabis. "We generally review the Commission's decisions regarding appointment of medical panels for abuse of discretion," and "reverse only if there is no reasonable basis for the decision." *Nucor v. Labor Comm'n*, 2023 UT App 164, ¶ 15, 542 P.3d 951 (quotation simplified).

¶24 In addition to the issues the Company raises, Johnson raises an issue of his own: he asks that we award him attorney fees and costs, pursuant to rule 33 of the Utah Rules of Appellate Procedure, incurred in defending against the Company's petition for judicial review. This issue is presented to us in the first

instance, and we accordingly make our determination as a matter of law. *Cf. Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (stating that when an issue is raised for the first time before this court, "there is no lower court ruling to review" and we must decide the question in the first instance as a matter of law).

ANALYSIS

I. Medical Causation

¶25 The Company's first challenge is to the Commission's medical causation determination: that Johnson's headaches and the worsening of his psychiatric symptoms were medically caused by the Accident. In particular, the Company asserts that the Commission's determination is not supported by substantial evidence. Ultimately, for the reasons discussed, we reject the Company's challenge. Before addressing the merits of that challenge, however, we discuss certain preliminary issues and standards, including the legal standards governing both "substantial evidence" and "medical causation," as well as our understanding of the scope of the Company's challenge.

A.     Preliminary Issues and Standards

¶26 The "substantial evidence" standard is the metric appellate courts use to evaluate the soundness of an administrative agency's factual findings, including determinations regarding medical causation. *See Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242 ("[A] challenge to an administrative agency's finding of fact is reviewed for substantial evidence."); *YESCO v. Labor Comm'n*, 2021 UT App 96, ¶ 13, 497 P.3d 839 (noting that an agency's determination that medical causation is present "is a question of fact we review for substantial evidence"). This standard is a deferential one: "in conducting a substantial evidence review, we do not reweigh the evidence and independently choose which inferences we find to be the most

reasonable." *Provo City*, 2015 UT 32, ¶ 8 (quotation simplified). "Instead, we defer to an administrative agency's findings because when reasonably conflicting views arise, it is the agency's province to draw inferences and resolve these conflicts." *Id.* (quotation simplified); *see also YESCO*, 2021 UT App 96, ¶ 19 ("Merely pointing to conflicting facts and evidence is insufficient to undermine substantial evidence supporting the finding." (quotation simplified)). Moreover, "substantial evidence" need not necessarily constitute a preponderance of the evidence—our supreme court has made clear that substantial evidence is "more than a mere scintilla of evidence though something less than the weight of the evidence." *Martinez v. Media-Paymaster Plus*, 2007 UT 42, ¶ 35, 164 P.3d 384 (quotation simplified). In short, "a decision is supported by substantial evidence if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Provo City*, 2015 UT 32, ¶ 8 (quotation simplified).

¶27　And our "medical causation" inquiry is similarly broad: a claimant need only "show that an industrial accident was *a* cause of the condition or injury requiring treatment." *See YESCO*, 2021 UT App 96, ¶ 15 (quotation simplified); *see also Cox v. Labor Comm'n*, 2017 UT App 175, ¶ 18, 405 P.3d 863 (stating that a claimant "satisfies the medical causation standard" by "proving that the industrial accident is *a* cause—as opposed to *the* cause— of the condition requiring treatment"), *modified on other grounds by Morris v. Labor Comm'n*, 2021 UT App 131, 503 P.3d 519. After all, the purpose of the medical causation requirement "is to ensure that there is a medically demonstrable causal link between" the work-related incident and the employee's injuries. *See Allen v. Industrial Comm'n*, 729 P.2d 15, 27 (Utah 1986). Thus, "a correct formulation of this standard asks whether the industrial accident contributed to the employee's medical condition in any degree, such as by aggravating a preexisting condition, or . . . by aggravating other contributing non-industrial factors." *YESCO*, 2021 UT App 96, ¶ 15 (quotation simplified).

¶28 In this proceeding, it falls to the Company—as the proponent of judicial review—to meet the burden of persuading us that no substantial evidence supports the Commission's medical causation finding. *See State v. Nielsen*, 2014 UT 10, ¶ 35, 326 P.3d 645 (referring to "an appellant's broader burden of overcoming the weighty deference granted to factual determinations in the trial court"). In years past, appellants challenging the sufficiency of the evidence were expressly required, in their opening brief, to marshal the evidence supporting the challenged ruling and explain why that evidence was insufficient. *See id.* ¶ 37 (noting that our supreme court had "sometimes . . . identified a marshaling deficiency as a ground for an appellant's procedural default"). To properly marshal the evidence, "the challenging party must temporarily remove its own prejudices and fully embrace the adversary's position; he or she must play the devil's advocate." *Peterson Hunting v. Labor Comm'n*, 2012 UT App 14, ¶ 15, 269 P.3d 998 (quotation simplified). Our supreme court has since clarified, however, that a party does not lose its appeal by default simply for failure to marshal. *See Nielsen*, 2014 UT 10, ¶ 41. But the court "reaffirm[ed] the traditional principle of marshaling as a natural extension of an appellant's burden of persuasion," and it stated that "a party challenging a factual finding or sufficiency of the evidence . . . will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal." *Id.* ¶¶ 41–42. These principles apply in administrative agency cases, just as they do in appeals from district courts. *See Peterson Hunting*, 2012 UT App 14, ¶ 15.

¶29 As a final preliminary matter, we make clear our understanding of the scope of the Company's challenge to the medical causation finding, and specifically our understanding of the Company's position regarding the evidentiary status of the medical panel reports. As we understand and interpret the Company's opening brief, the Company is asserting that the Commission's medical causation finding is not supported by substantial evidence; as a corollary to this argument, the

Company maintains that the reports from the medical panel, for various reasons, do not constitute substantial evidence. In making this argument, the Company appears to assume that the medical panel reports are properly in evidence; that is, the Company offers reasons why it considers those reports unpersuasive and insubstantial, but it does not appear to be challenging the ALJ's or the Commission's decision to admit those reports into evidence or to decline to strike them from the record. To be sure, the Company mentions in passing—in its summary of the argument and in its conclusion—that it was "error for the ALJ to admit the Medical Panel report as a whole into evidence." But the Company did not list this issue as one of the issues it is presenting for our review, and it did not substantively brief this issue in the body of its brief. Thus, we interpret the Company's brief as not challenging the decision to admit the medical panel reports into evidence; at a minimum, any such argument is inadequately briefed. For purposes of our substantial evidence review, we therefore consider the medical panel reports to be part of the record.

B.    Substantial Evidence of Medical Causation

¶30    With these background principles in mind, we now turn to the merits of the Company's challenge to the Commission's medical causation finding. This challenge has two parts: the Company challenges the medical causation finding regarding both (1) the worsening of Johnson's psychiatric symptoms and (2) Johnson's headache symptoms.

1.    Worsening of Psychiatric Symptoms

¶31    Ample evidence supports the Commission's finding that the Accident contributed to the worsening of Johnson's psychiatric symptoms. For starters, there's Johnson's own hearing testimony, in which he stated that his preexisting symptoms had been "well controlled" before the Accident but that since then, his anxiety and depression have worsened. In its reply brief, the Company derides this testimony as self-serving and "uncredible,"

but credibility determinations are for the factfinder to make, *see Bade-Brown v. Labor Comm'n*, 2016 UT App 65, ¶ 19, 372 P.3d 44 ("It is the Commission's role as the ultimate fact-finder to weigh the evidence and make credibility determinations."), and the Company gives us no good reason to second-guess the Commission's decision to credit Johnson's testimony.

¶32 In addition to Johnson's own testimony, several of the treating health care professionals—including most notably the neurologist—concluded that the Accident contributed to the worsening of Johnson's symptoms. After examining Johnson, the neurologist concluded that the worsening of Johnson's psychological symptoms was due, at least in part, "to the work injury on 12/21/2019." And the neurologist submitted a declaration in rebuttal to the Company's expert reports, in which he again opined that Johnson was experiencing "anxiety and depression that were directly caused by the [A]ccident." In its reply brief, the Company criticizes the treating professionals' reports, asserting that they are unpersuasive because, among other reasons, they relied to a significant degree on Johnson's own self-reporting of his symptoms. But assessing the persuasiveness of admitted evidence is precisely the job of the factfinder, and given our standard of review we are not in a position to second-guess the Commission's choice to rely upon the medical evidence from Johnson's treating professionals.

¶33 Finally, the Commission relied upon the reports from the medical panel. As noted, the panel clearly concluded—both in its initial report and in its addendum—that the Accident had been at least *a* contributing cause to the worsening of Johnson's psychological symptoms. And, as noted, the Company does not here challenge the inclusion of those reports in the universe of evidence to be considered by the Commission.

¶34 The evidence described in the preceding paragraphs is quite clearly enough to surmount the deferential "substantial

evidence" standard. But the Company did not tell us about much of this evidence in its opening brief—we had to learn about a lot of it from Johnson's opposition brief and from our own review of the record. Stated another way, the Company made no effort, in its opening brief, to marshal the evidence in support of the Commission's finding and to explain why that evidence was not substantial enough to meet the standard. As mentioned above, when a party who bears the burden of appellate persuasion fails to marshal the evidence in its opening brief, that party "will almost certainly fail to carry its burden of persuasion on appeal." *See Nielsen*, 2014 UT 10, ¶ 42. That is the case here.

¶35     Instead of trying to marshal the evidence, the Company spent considerable energy in its opening brief attacking the persuasiveness of the medical panel reports and emphasizing the significant amount of cannabis that Johnson (at least for a time) was consuming. We address these arguments below, but before doing so we note that even if the medical panel reports were *not* part of the evidentiary record, the other evidence in the record— Johnson's own testimony and the reports and evidence from the treating professionals, most notably the neurologist—would likely be enough, on its own, to constitute substantial evidence supporting the medical causation finding. *See Horning v. Labor Comm'n*, 2023 UT App 30, ¶ 33, 529 P.3d 352 ("Because the Commission's findings were based on not only the report of the medical panel—which itself constituted substantial evidence before the Commission—but also the corroborating reports of other doctors and the entirety of the medical record, we conclude that the Commission's findings were supported by substantial evidence and should not be disturbed.").

¶36     With regard to the medical panel reports, the Company argues that they are unpersuasive because they establish only a possibility—and not a medical probability—that the Accident worsened Johnson's symptoms. We disagree. While the medical panel did not use the phrase "medical probability," it spoke in

clear declarative sentences ("It is our medical opinion [that Johnson's symptoms] worsened from the industrial accident," and "We believe [Johnson's] industrial accident did initially worsen his" symptoms) in reaching its finding regarding medical causation of Johnson's worsened symptoms, and in setting forth this finding it did not generally use words like "may," "might," "could have," or "possibility."[2] Our reading of the medical panel reports is simply different from the Company's.[3]

¶37 The Company also argues that the medical panel reports are unpersuasive for other reasons, criticizing the panel for—in its view—not adequately explaining away certain of the Company's arguments, including particularly the Company's emphasis on Johnson's cannabis use. But these arguments go to the weight the factfinder gives to the panel reports, and are arguments better suited to an evidentiary hearing before a factfinder than to appellate challenges. The ALJ and the Commission found these arguments unpersuasive, and given the standard of review, we are not inclined to second-guess the factfinder's choice about how much weight to give the panel's conclusions.

---

2. In its initial report, the panel did state that Johnson's cannabis use "may be contributing to current symptoms." But after it was asked to clarify, the panel made a more definitive statement in its addendum report: that Johnson's cannabis use was "worsening" his psychological symptoms and that it "ha[d] exacerbated his condition." As we read the record, all of the panel's ultimate conclusions were phrased in clear and definitive language.

3. Moreover, and in any event, the neurologist *did* use the phrase "medical certainty," stating in his report that all of his opinions— including the ones about Johnson's worsened symptoms being caused by the Accident—were "made within a reasonable degree of medical certainty." The Company made no mention of this fact in its opening brief.

¶38 Finally, the Company asserts that Johnson's cannabis use broke the "chain of causation" and therefore should be considered the only medical cause of his worsened psychological symptoms. In support of this contention, the Company points to case law emphasizing the claimant's burden to "demonstrate that the subsequent aggravation is the 'natural result' of the primary workplace injury or accident."[4] *See Oliver v. Labor Comm'n*, 2013 UT App 301, ¶ 12, 318 P.3d 777 (quotation simplified); *accord Washington County School Dist. v. Labor Comm'n*, 2013 UT App 205, ¶ 24, 309 P.3d 299. The Company argues that Johnson's significant cannabis use was "not a natural result of" the Accident. But that isn't the relevant question: no one contends that Johnson's cannabis use was caused by the Accident. The question is whether Johnson's worsened symptoms are a "natural result" of the Accident. And as already noted, plentiful evidence supports this conclusion, including the medical panel's nuanced conclusion that *both* the Accident *and* Johnson's cannabis use contributed to the worsening of Johnson's psychological symptoms, and its determination that Johnson's "cannabis use cannot fully explain the onset or course of his persistent psychiatric symptoms."

---

4. Although the Company's argument, at times, sounds like a "superseding cause" argument, the Company at no point cites superseding cause case law from the tort context and at no point makes any argument that the superseding cause doctrine from tort law applies in the workers' compensation context. There is reason to be skeptical of such an argument. *See Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, ¶ 17, 203 P.3d 962 ("The primary objective of workers' compensation has been to remove industrial negligence, in all its forms, from the concept of the law of tort." (quotation simplified)). But because no party is asking us to weigh in on the question, we express no opinion about whether that doctrine applies in workers' compensation cases, and we do not purport to apply it here.

¶39 For all of these reasons, we reject the Company's challenge to the Commission's factual finding that the worsening of Johnson's psychological symptoms was medically caused by the Accident. Substantial evidence supports this finding, and for this reason we decline to disturb it.

2. Headaches

¶40 Ample evidence also supports the Commission's finding that the Accident medically caused Johnson's headaches. But before we discuss some of that evidence, we first address the Company's representation, in its brief, that the Accident was one in which "the head did not suffer any injury or trauma" and that "the evidence shows" that Johnson's "head did not strike anything during [the Accident]." At best, this is an aggressive mischaracterization of the evidence; at worst, it is an outright misrepresentation.

¶41 Johnson was resting unrestrained—due to the Company's failure to fix the safety net—in the truck's sleeper berth when the truck rolled over while going some 65 miles per hour. As a matter of simple common sense, it is difficult to imagine—simply from the undisputed mechanism of the Accident—that Johnson didn't hit his head on *something*.

¶42 But even aside from the rather obvious nature of the situation, the overwhelming weight of the testimony and medical evidence indicates that Johnson did indeed strike his head during the Accident. Again, for starters, Johnson testified under oath at the hearing that he was "thrown around" inside the sleeper berth during the Accident and that he "remember[ed] striking [his] head" and other body parts against "the bottom of the top bunk, bottom bunk, the cabinets, the back wall, and the side walls." To be sure, when Johnson first appeared in the emergency department immediately after the Accident, he could not remember if he had hit his head. But he certainly didn't deny hitting his head, and his later sworn hearing testimony was

unequivocal on the point. Not only that, the Company's own retained orthopedic surgeon noted, in his examination report, that Johnson reported "striking his head" during the Accident.

¶43 The medical records also support the conclusion that Johnson hit his head during the Accident. In the emergency department on the day of the Accident, doctors found an "abrasion" on Johnson's "left upper brow," a finding consistent with the record from the occupational medicine clinic ten days later, where it was noted that Johnson had "lacerations on the left eyebrow . . . which [were] healing." Even the Company's retained experts—both of them—found that Johnson had sustained a "[l]eft eyebrow laceration" in the Accident. One wonders how Johnson could have gotten a laceration on his eyebrow during the Accident without hitting his head on something.

¶44 In addition, multiple health care professionals who treated Johnson in the weeks and months after the Accident noted that Johnson had an "unspecified" head injury, a "concussion without loss of consciousness," or "post-concussion syndrome." While the medical panel eventually found that Johnson had not sustained a concussion, this other evidence—especially viewed in tandem with Johnson's testimony and the eyebrow laceration—is nevertheless strongly supportive of the notion that Johnson hit his head during the Accident. Given the state of the record, we are disappointed by the Company's declarative assertion—unaccompanied by any marshaling of evidence to the contrary—that "the evidence shows" that Johnson's "head did not strike anything" during the Accident.

¶45 As for the Company's overarching challenge to the medical causation finding regarding headaches, the record submitted to us contains ample evidence supporting the Commission's finding. Again, we begin with Johnson's sworn hearing testimony: that after the Accident, he began experiencing headaches that were different from headaches he had suffered

before, and that they had persisted on a regular basis up to the date of the hearing. The Company discounts this evidence as self-serving and unsupported by "objective testing," but the testimony is part of the record and the factfinder is entitled to credit it.

¶46   In addition to Johnson's own testimony, the neurologist and the physicians on the medical panel all found that Johnson's headaches were caused by the Accident. The neurologist opined, to a "reasonable medical certainty," that Johnson's headaches were "due to the work injury on 12/21/2019." Notably, the Company made no mention of this evidence in its opening brief, despite its responsibility to marshal the evidence if it is to meet its appellate burden of persuasion. And the medical panel noted that Johnson "had no history of severe or chronic headaches prior to the [A]ccident and his headaches became severe and chronic after the injury," and it therefore concluded that Johnson's "headaches [were] industrially related."

¶47   The Company assails the medical panel's conclusion as insufficiently substantial, asserting that the panel did not conduct any "objective testing" and that it did not find that Johnson had suffered a concussion or other brain injury. In addition, the Company criticizes the panel for relying on Johnson's testimony regarding the onset of his headaches, arguing that Johnson's self-report merely supports "correlation" and not "causation." These arguments—while perhaps decent trial-level arguments—are simply not persuasive in the current procedural posture, where we are evaluating the Commission's factual finding and where we are required to defer to those findings so long as they are supported by credible evidence. These arguments ultimately amount to little more than complaints about the amount of weight the factfinder elected to give to certain items of admitted evidence, and such arguments find little traction given our standard of review. *See YESCO v. Labor Comm'n*, 2021 UT App 96, ¶ 18, 497 P.3d 839 ("As the ultimate factfinder, it is the Commission's role to weigh the evidence, resolve any conflicts,

and draw reasonable inferences therefrom in finding medical causation." (quotation simplified)).

¶48 Accordingly, we reject the Company's challenge to the Commission's finding that Johnson's headaches were medically caused by the Accident.

## II. A Third Remand to Medical Panel

¶49 Next, the Company challenges the Commission's implicit rejection of its request—made in the reply brief in support of its motion for review—that the Commission send the matter to the medical panel, for a third time, for reevaluation in light of Johnson's unverified contention that he had ceased cannabis use after issuance of the panel's initial report.[5] The Commission has "discretionary power" from our legislature regarding the appointment of medical panels. *Nucor v. Labor Comm'n*, 2023 UT App 164, ¶ 15, 542 P.3d 951 (quotation simplified). We therefore review decisions regarding referrals to medical panels for abuse of discretion, and we decline to disturb them as long as the decision was made within the "range of acceptable" choices. *Id*. (quotation simplified). In other words, as long as there was a "reasonable basis" for the Commission's decision, we will affirm. *Id*. (quotation simplified).

¶50 Here, we discern no abuse of discretion in the Commission's implicit decision to decline to send the matter to the medical panel for a third time. The panel had already reviewed Johnson's case twice, and it had twice concluded that the worsening of Johnson's psychological symptoms was caused,

---

5. Johnson argues that the Company did not preserve the issue of whether the case should have been sent back to the medical panel for a third time. However, as noted, the Company did raise the issue, albeit in an unconventional way. Thus, we consider the issue preserved for our review, and we proceed to consider the Company's challenge on its merits.

at least in part, by the Accident. The only new fact that might have changed the calculus was the assertion—made by Johnson's counsel in an opposition brief—that following the issuance of the panel's first report, Johnson had stopped using cannabis. Since no testimony or evidence was taken on this point, it is unclear whether Johnson was claiming to have ceased *all* cannabis use, or merely cut back. Moreover, in the same brief, Johnson's counsel represented that, despite the change in cannabis use, Johnson was still suffering from "continued depression [and] anxiety."

¶51    The Company has not borne its burden of demonstrating abuse of discretion here. Its analysis on this point in its principal brief is composed of a single paragraph, and therein the Company simply fails to explain how the "fact" of Johnson's cessation or diminishment of cannabis consumption—even if true—could potentially affect the Commission's determination of medical causation here in a way that would benefit the Company's position. For purposes of the Commission's analysis, it appeared to assume that Johnson was using significant amounts of cannabis; certainly, it made no mention, in its written ruling, of Johnson's new extra-record assertion that he had ceased cannabis use. If one assumes (as the Company is apparently asking us to do) the veracity of Johnson's extra-record assertions—that he had ceased using cannabis and that it hadn't made much difference in the severity of his symptoms—it is difficult to see how the new evidence could have benefited the Company's position.

¶52    Indeed, in this situation, there was little reason to believe that the outcome of a third report would have been materially different from the first two. And because this particular remand would likely have necessitated an entirely new examination of Johnson by the panel (as opposed to simply having the panel answer follow-up questions regarding its previous examination), the delay in granting the Company's remand request may have been considerable. In this context, we afford the Commission substantial deference in determining, on the facts of each

individual case, whether a particular change in medical circumstances is significant enough to warrant pausing the case yet again to seek additional clarification from the medical panel.

¶53   Here, we can readily envision a "reasonable basis" for the Commission's implicit denial of the Company's request, *see id.* (quotation simplified), and therefore we conclude that the Commission acted within its discretion to decline the Company's invitation for further consultation with the panel.

### III. Attorney Fees

¶54   The final issue we must confront is Johnson's request that we award him attorney fees pursuant to rule 33 of the Utah Rules of Appellate Procedure. That rule states, in relevant part, that

> if the court determines that a motion made or appeal taken under these rules is either frivolous or for delay, it will award just damages, which may include single or double costs . . . and/or reasonable attorney fees, to the prevailing party.

Utah R. App. P. 33(a). The term "frivolous" is given a specific definition: "a frivolous appeal . . . is one that is not grounded in fact, not warranted by existing law, or not based on a good faith argument to extend, modify, or reverse existing law." *Id.* R. 33(b). Johnson asserts that the Company's appeal is "frivolous" because it "was not grounded in fact." And in particular, Johnson points out that the Company's brief "never examined the underlying evidence that is required under substantial evidence review" and "made no attempt to marshal the evidence, or to even identify the evidence that supported" the Commission's findings. Johnson's assertions are entirely correct, and—even keeping in mind our institutional hesitancy to award fees pursuant to rule 33, *see Johnson v. Nationstar Mortgage LLC*, 2020 UT App 127, n.6, 475 P.3d 140 (stating that "the imposition of . . . sanction [under rule 33] is a serious matter and only to be used in egregious cases, lest the

threat of such sanctions should chill litigants' rights to appeal lower court decisions" (quotation simplified))—we conclude that an award of fees is appropriate here, for several reasons.

¶55 First, we are troubled by the Company's mischaracterization of the facts of the case regarding whether Johnson hit his head during the Accident. We acknowledge that the medical panel found that Johnson had not sustained a brain injury. But that is a different question from whether he struck his head, and on that score the record is quite clear: Johnson did strike his head as he was being "thrown around" unrestrained in the sleeper berth during the high-speed Accident. Often, the records submitted to us in workers' compensation cases are lengthy, voluminous, and dense with medical jargon. We depend on the attorneys who practice regularly in this area of the law—a category that includes the Company's attorneys—to assist us by accurately and helpfully describing the contents of those records in their briefs. And when attorneys find it necessary to resort to mischaracterization of facts, we think it fair to take that as an indication that the attorneys' position is "not grounded in fact." *See* Utah R. App. P. 33(b).

¶56 Second, the Company made no effort to marshal the evidence that supported the Commission's challenged findings. When a party who is challenging the sufficiency of the evidence supporting factual findings fails to marshal the evidence, it makes the opponent's job—not to mention the court's job—much more difficult and time-consuming. We certainly stop well short of holding that a failure to marshal the evidence, by itself, will warrant an award of attorney fees pursuant to rule 33. But in tandem with other factors, and depending on the nature of the case, failure to marshal might be an indication that the arguments made to an appellate court are "not grounded in fact" or "not warranted by existing law." *Id.* And we think it is here.

¶57 Third, the "substantial evidence" challenge raised by the Company was utterly meritless. Once we dug into the record ourselves (with assistance from Johnson's brief) given the lack of marshaling, we discovered ample evidence supporting the Commission's challenged findings, including the mechanism of the Accident itself, Johnson's own sworn testimony, and records from treating professionals, most notably the neurologist. While the Company devoted most of its opening brief to criticism of the medical panel reports, the Company failed to mention these other key items of evidence in the record that—together and likely even in the absence of the medical panel reports—constitute sufficiently substantial evidence to support the challenged findings. Thus, on its merits, especially given the deferential standard of review, the Company's main argument was simply not well taken. Moreover, where, as here, there exists a large amount of supporting evidence that should have been marshaled and was not, the failure to marshal takes on added significance. We find it difficult to imagine that the Company was unaware of the contradictory evidence when it filed its opening brief.

¶58 Accordingly, we conclude that the Company's petition for judicial review is "frivolous" under the definition of that term employed in rule 33(b). We therefore grant Johnson's motion for an award of attorney fees and single costs, and we send this matter back to the Commission for quantification of that award.

CONCLUSION

¶59 Substantial evidence exists, in this record, to support all of the Commission's findings that the Company challenges in this proceeding. And the Commission did not abuse its discretion in declining the Company's invitation to seek the medical panel's input for a third time. We therefore decline to disturb the Commission's award of benefits to Johnson.

¶60 Furthermore, given our conclusion that the Company's petition for review is "frivolous," we grant Johnson's motion for an award of attorney fees and single costs, and we send this matter back to the Commission for determination of the amount of those fees and costs.

———————